## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**DAVID HUDAK** and **INTERNATIONAL**
**HYDRO CUT TECHNOLOGIES CORP.**,

        Plaintiffs,

        vs.                      No.   **CIV 04-1150 MCA/DJS**

**JET RESEARCH CENTER**, a division of
**HALLIBURTON ENERGY SERVICES**,
**JET RESEARCH CENTER**, a subsidiary of
**HALLIBURTON ENERGY SERVICES**,
**HALLIBURTON ENERGY SERVICES**,
**ACCURATE ARMS COMPANY** d/b/a
**ACCURATE ENERGETIC SYSTEMS, LLC**,
and **JOHN SONDAY**,

        Defendants.

## MEMORANDUM OPINION AND ORDER

       **THIS MATTER** comes before the Court on the following motions:  (1) Defendant
*Halliburton Energy Services, Inc.'s Motion to Dismiss Plaintiffs' Complaint for Failure to
State a Claim and for Improper Venue* [Doc. 19] filed on December 27, 2004, and adopted
by Defendant Jet Research Center [Doc. 27, 39] on January 24, 2005, and February 17, 2005;
(2) *Defendant Halliburton Energy Services, Inc.'s Motion to Transfer Venue and Brief in
Support* [Doc. 28] filed on January 28, 2005,  joined by Defendants Accurate Arms Company
and John Sonday [Doc. 30] on January 31, 2005, and adopted by Defendant Jet Research
Center [Doc. 50] on March 25, 2005; and (3) *Defendants Accurate Arms Company and John*

*Sonday's Motion for Judgment on the Pleadings for Lack of Personal Jurisdiction, Failure to State a Claim, Improper Venue and Lack of Legal Entity* [Doc. 61] filed on May 11, 2005. Having considered the parties' submissions, the relevant law, and being otherwise fully advised in the premises, the Court determines that Plaintiffs' *Complaint* states claims upon which relief may be granted under the Racketeer Influenced and Corrupt Organizations (RICO) Act and that jurisdiction and venue properly lie in the District of New Mexico. Therefore, Defendants' motions are denied, and Plaintiffs shall be afforded the opportunity to conduct discovery in this action.

## I.    BACKGROUND

On October 12, 2004, Plaintiffs David Hudak and International Hydro Cut Technologies Corporation (Hydro Cut) filed this civil action in the United States District Court for the District of New Mexico alleging civil RICO violations, fraud, breach of contract, unfair trade practices, breach of implied covenant of good faith and fair dealing, intentional infliction of emotional distress, and negligence on the part of Defendants Jet Research Center (JRC), Halliburton Energy Services, Inc. (HESI), Accurate Arms Company d/b/a Accurate Energetic Systems, LLC (Accurate), and John Sonday.  [Doc. 1.]  This civil action follows on the heels of Mr. Hudak's acquittal in a criminal trial prosecuted by the United States Department of Justice, in which the charges against Mr. Hudak included knowingly possessing unregistered destructive devices that law enforcement agents seized from an explosives magazine at his place of business in Roswell, New Mexico in August

2002.  See United States v. Hudak, No. CR 02-1574 MCA (D.N.M. judgment of acquittal filed Nov. 24, 2003).

Mr. Hudak was detained in jail while these criminal charges were pending, and the devices he was charged with illegally possessing also were seized and later forfeited.  Mr. Hudak claims that the seizures and pretrial detention, as well as the time and resources he and his associates had to devote to investigating and defending against the criminal charges, adversely affected the affairs of Hydro Cut, a Canadian business of which he is the primary shareholder and President/CEO.

In the criminal prosecution of Mr. Hudak, several representatives of the United States Government took the position that the devices seized from his explosives magazine in Roswell, New Mexico are, and always were, explosive warhead components of a Shoulder Launched Multipurpose Assault Weapon (SMAW) system belonging to the United States Department of Defense and listed as defense articles on the United States Munitions Import List.  Private parties allegedly do not have the lawful right to sell, purchase, export, import, or possess such items without appropriate licenses granted by the United States Government.

Mr. Hudak was initially charged with one count of illegally possessing the devices that the Government identified as SMAW warheads, and one count of possessing other firearms the illegality of which depended on Mr. Hudak's immigration status as a Canadian citizen working in the United States.  Later versions of the indictment also charged Mr. Hudak with illegally importing the SMAW warheads from Canada into the United States, as well as several other crimes relating to the operation of a counter-terrorism training school for foreign

nationals at the Roswell facility.  The illegal importation charge was dismissed without prejudice shortly before trial at the request of the prosecution.

In this civil action, Plaintiffs allege that the SMAW warheads which were at issue in Mr. Hudak's criminal prosecution are the same devices which Defendants advertised, sold, and exported to Plaintiffs in a series of transactions spanning the years 1993 and 1994. Plaintiffs further allege that in negotiating this sale and obtaining the necessary approvals to ship the SMAW warheads to Plaintiffs' place of business in Canada, Defendants falsely represented to Plaintiffs and others that the devices were demilitarized "demolition charges" which Defendants owned and which private parties could buy, sell, import, and export for commercial purposes.  At the time of the sale and thereafter, Plaintiffs claim they did not know the correct classification of the SMAW warheads and relied to their detriment on Defendants' false representations that the devices were lawfully demilitarized "demolition charges."  Plaintiffs also claim that Defendants continued to provide false information about the devices during Mr. Hudak's criminal prosecution, when they received queries about their involvement in unlawfully transferring these devices to Plaintiffs.

According to Plaintiffs, they never would have purchased the SMAW warheads, or transported them back and forth across the border between the United States and Canada, had Defendants disclosed the devices' proper classification and ownership instead of falsely representing that they were privately owned, demilitarized "demolition charges."  Thus, Plaintiffs' *Complaint* alleges that these false representations are ultimately what caused them

-4-

to suffer the damages occasioned by the Government's seizure of the SMAW warheads, the criminal prosecution of Mr. Hudak, and the ensuing interruption of Hydro Cut's business.

After Plaintiffs filed their *Complaint*, the parties requested and were granted numerous extensions to brief several dispositive motions filed by Defendants under Fed. R. Civ. P. 12(b), Fed. R. Civ. P. 12(c),  and 28 U.S.C. § 1404(a).  [Doc. 10, 11, 14, 16, 24, 25, 32, 33, 34, 36, 42, 45, 63, 64, 66, 67, 68, 71, 73, 74, 75, 76.]  Plaintiffs oppose Defendants' motions and request leave to amend their pleading and/or conduct jurisdictional discovery if the Court deems it necessary to remedy any defect in their *Complaint*.  [Doc. 29, 43, 51, 54, 70.]

The focus of Defendants' motions is on the legal sufficiency of the civil RICO claims asserted in Counts 1 through 4 of Plaintiff's *Complaint*.  Defendants also assert that the District of New Mexico is not the proper venue for this action and that this Court lacks personal jurisdiction over Defendants JRC, Sonday, and Accurate.  These challenges to jurisdiction and venue are to some degree contingent on the legal sufficiency of Plaintiffs' civil RICO claims.  [Doc. 19, 27, 28, 30, 39, 50, 61.]

The civil RICO claims in Plaintiffs' *Complaint* group the Defendants into two schemes:  (1) the "JRC/Halliburton Scheme" and (2) the "JRC/Accurate Scheme."  [Doc. 1.] The distinction between the two schemes seems to hinge on HESI's sale of JRC's Defense and Aerospace Division to Accurate.  The pattern of activity which began before that sale or arose independently from it is alleged to form the "JRC/Halliburton Scheme," while the pattern of activity that arose during Accurate's involvement with the sale is attributed to the "JRC/Accurate Scheme."

The foundation for understanding these two schemes and how they relate to one another lies in a complex set of relationships among the Defendants, the United States Department of Defense, and other government contractors involved in producing the SMAW weapons system. For purposes of determining the legal sufficiency of Plaintiffs' civil RICO claims, I will summarize these relationships as they are alleged in Plaintiffs' *Complaint*. I also keep in mind, however, that Defendants may contest the truth of these allegations for purposes of their motions to dismiss based on lack of personal jurisdiction and improper venue, which are subject to a different standard of review.

According to Plaintiffs' *Complaint*, McDonnell Douglas Corporation (MDC) held the government contract to produce the SMAW weapons system for the United States Department of Defense (DOD) and, more specifically, the United States Marine Corps (USMC). DOD and MDC in turn subcontracted with JRC to manufacture the explosive warhead component of the system that Mr. Hudak was later charged with illegally possessing.

The government contract for the SMAW weapons system provided that the specifications for the warhead, as well as all SMAW warheads manufactured under the contract, were the property of the United States Government. This provision included all the warheads that were rejected because they did not conform to military specifications and were never actually transferred to the USMC for military use. The contract specifically required that all such non-conforming, unused warheads had to be destroyed pursuant to government regulations, and none of the warheads could be sold commercially in the private sector.

In addition to producing explosive warheads for the SMAW weapons system, JRC engaged in the business of manufacturing a variety of other explosives and energetic materials for sale to both government and commercial end-users.  In particular, JRC manufactured and sold a number of specialized energetic materials--unrelated to the SMAW weapons system--to Plaintiffs between 1988 and 1994.  Plaintiffs in turn used these materials in their legitimate business activities in Canada and elsewhere, which included contracts with the Canadian government.

At the time JRC first developed its supplier-purchaser relationship with Plaintiffs, JRC was a North Carolina subsidiary of HESI.  Because of this parent-subsidiary relationship, HESI often was involved in JRC's transactions with Plaintiffs, particularly with respect to financial matters such as extending credit.  HESI also sold products directly to Plaintiffs without going through JRC.

JRC operated a manufacturing center for explosives on a site in Swannanoa, North Carolina, that was owned by HESI.  It was at this site that JRC manufactured the SMAW warheads and stored thousands of non-conforming warheads until 1993 or 1994.  During that time, HESI was in the process of closing down operations on the Swannanoa property because the United States Environmental Protection Agency (EPA) had designated it as a "Superfund" site.  This closure occurred in conjunction with a federally regulated and federally mandated cleanup of contaminated groundwater and capping of waste wells at the Swannanoa site.

The closing of the Swannanoa property allegedly affected JRC's operations on that site and led HESI to consider selling JRC's Defense and Aerospace Division to another company

-7-

in lieu of moving it to another location.  HESI eventually found a purchaser, which is named in Plaintiffs' *Complaint* as "Accurate Arms Company d/b/a Accurate Energetic Systems, LLC."  For purposes of summarizing and discussing Plaintiffs' civil RICO claims, I will simply refer to this entity and its officers as "Accurate."  As noted above, I will defer my discussion of the finer distinctions between Accurate Arms Company and other related entities, as well as Defendant John Sonday's role in those entities, until my analysis of Defendants' motions to dismiss for lack of personal jurisdiction and improper venue.

HESI's sale of JRC's Defense and Aerospace Division included assignment of the division's pending contracts to Accurate, including any contracts the division had negotiated with Plaintiffs.  Thus, HESI and JRC had an economic incentive to negotiate pending contracts with end users such as Plaintiffs before the time these end-user contracts were assigned to Accurate, because the value of these assignments could then be factored into the price HESI and JRC negotiated for the transfer of the Defense and Aerospace Division to Accurate.

JRC first informed Plaintiffs of its proposed assignment of contracts to Accurate in April 1993.  JRC requested that Plaintiffs sign an agreement consenting to the assignment in August 1993.  The sale of JRC's division to Accurate was not completed, however, until February 9, 1994.

Plaintiffs allege that during and after the contract negotiations concerning the sale of JRC's Defense and Aerospace Division to Accurate in 1993 and 1994, HESI, JRC, and Accurate were acting in concert with one another to accomplish certain mutually beneficial

purposes associated with this sale.  It was during this period that JRC personnel (some of whom later became employees of Accurate) advertised, sold, and exported the shipment of non-conforming SMAW warheads that Mr. Hudak was later charged with illegally possessing.

Plaintiffs allege that JRC, HESI, and Accurate all knew of the non-conforming SMAW warheads stored at the Swannanoa facility and regarded them as an unwanted liability.  Thus, according to Plaintiffs, the three companies acted in concert with one another to find a way to appropriate these non-conforming SMAW warheads from the United States Government and sell them to unsuspecting buyers without having to pay the cost of properly destroying them per government regulations, or moving and storing them at Accurate's facilities in Tennessee.

Selling a shipment of over 2,500 SMAW warheads to Plaintiffs, under the false pretense that they were lawfully demilitarized "demolition charges," allegedly became one of Defendants' chosen means of accomplishing this objective.  According to Plaintiffs, Defendants took advantage of the good will that JRC and HESI had developed in their supplier-purchaser relationship during the preceding years, as well as their reputations and resources as government contractors with substantial links to the United States Department of Defense, in order to further this objective.

Based on testimony taken from Defendants' former agents or employees during Mr. Hudak's criminal trial, Plaintiffs also allege that Defendants sold other shipments of SMAW warheads or similar devices stockpiled on the Swannanoa property to other unsuspecting buyers in the private sector.  Again, Plaintiffs allege that JRC and Accurate were able to

accomplish such sales under false pretenses by taking advantage of the good will they had developed in past supplier-purchaser relationships, as well as their reputations and resources as defense contractors associated with the United States Government.

As noted above, these unauthorized sales of SMAW warheads roughly coincided with HESI's sale of JRC's Defense and Aerospace Division to Accurate.  In Plaintiffs' case, JRC first offered to sell the SMAW warheads in 1993 before the company's Defense and Aerospace Division became part of Accurate, and the contract for the SMAW warheads was then assigned to Accurate under the terms of Accurate's agreement with HESI and JRC.

Some of the JRC employees who worked on the sale of the SMAW warheads to Plaintiffs in 1993 became employees of Accurate in 1994 and continued to work on this transaction for their new employer.  These employees allegedly received aid from others, who remained under the employment of JRC and HESI, and who are alleged to have provided documentation necessary for the shipment of SMAW warheads to clear Canadian customs.

After the SMAW warheads were shipped, Plaintiffs sent a check for the agreed purchase price of $3,300 to Accurate, which deposited the check in its bank account in Nashville, Tennessee.  By that time, JRC had completed the sale of its Defense and Aerospace Division to Accurate, and the remaining components of JRC were to be reorganized as a division of HESI.

In reliance on the documentation that Defendants had prepared for Canadian customs officials when the SMAW warheads were originally shipped to Plaintiffs in 1994, Plaintiffs subsequently prepared another set of documents to obtain the necessary authorizations to

move most of the items received in this shipment from an explosives magazine in Canada to the explosives magazine in Roswell, New Mexico, where they and Mr. Hudak were eventually seized by law-enforcement agents in August 2002.  During the ensuing criminal prosecution of Mr. Hudak, Defendants were queried as part of Mr. Hudak's efforts to explain how he lawfully came into possession of the SMAW warheads.  In response to such queries, Defendants allegedly denied knowledge of the facts pertaining to their sale of the SMAW warheads to Plaintiffs and stated that all of their documents pertaining to the sale had been destroyed.

Although Mr. Hudak was eventually acquitted of all the criminal charges on which he was tried, the SMAW warheads were forfeited to the United States Government, and Mr. Hudak was not allowed to return to Canada to resume his business with Hydro Cut until after a lengthy period of pretrial detention, a five-week trial, and an additional period of detention relating to his immigration status in the United States.  It was during this period that Plaintiffs allege they suffered injury to their business and property caused by Defendants' racketeering activities.

## II.    <u>ANALYSIS</u>

Ordinarily, courts are obliged to address issues of personal jurisdiction and venue before discussing the merits of a parties' substantive claims, because in the absence of jurisdiction over a party or proper venue, there is no need for a discussion of the merits.  <u>See generally</u> <u>Republic of Panama v. BCCI Holdings (Luxembourg) S.A.</u>, 119 F.3d 935, 940-41 (11th Cir. 1997).  In this case, however, Defendants challenges to personal jurisdiction and

-11-

venue depend, in part, on whether Plaintiffs' *Complaint* states viable claims under the federal

RICO statute, which contains special provisions that may expand a court's authority to

exercise personal jurisdiction over a defendant and serve as a proper venue for litigating such

a claim.   In light of these special provisions, this Court's authority to exercise personal

jurisdiction over one or more of the Defendants and to serve as the proper venue for this

action may hinge on its answer to the question whether Plaintiffs' *Complaint* states a civil

RICO claim upon which relief may be granted as to each Defendant.   It is for these reasons

that I answer the latter question first before turning to the issues of personal jurisdiction and

venue.

### A.    <u>Standards of Review</u>

There are, in essence, four different standards of review applicable to the pending

motions in this case.   One standard of review applies to motions to dismiss for failure to state

a claim under Fed. R. Civ. P. 12(b)(6), motions for judgment on the pleadings under Fed. R.

Civ. P. 12(c), and motions to dismiss a fraud claim on the grounds that it fails to meet the

particularity requirements of Fed. R. Civ. P. 9(b).   <u>See</u> <u>Nelson v. State Farm Mut. Auto. Ins.</u>

<u>Co.</u>, 419 F.3d 1117, 1119 (10th Cir. 2005) (equating standard of review under Rule 12(c) with

standard of review under Rule 12(b)(6));   <u>United States v. Cheng</u>, 184 F.R.D. 399, 400-01

(D.N.M. 1998) (treating a challenge under Rule 9(b) as a motion to dismiss under Rule

12(b)(6)).   Under this first standard, the Court may dismiss a complaint for failure to state a

claim upon which relief may be granted at any time.   <u>See</u> Fed. R. Civ. P. 12(h)(2).   Dismissal

on these grounds may occur *sua sponte* or upon a defendant's motion.   <u>See</u> <u>Curley v. Perry</u>,

246 F.3d 1278, 1284 (10th Cir. 2001).  When requested in a defendant's motion, dismissal under this rule is appropriate only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir.1997) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  *Sua sponte* dismissal in this context is only appropriate when it is patently obvious that the plaintiff cannot prevail on the facts alleged, and allowing an opportunity to amend would be futile.  See Hall v. Bellmon, 935 F.2d 1106, 1109-10 (10th Cir.1991); Curley, 246 F.3d at 1284.

"The court's  function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  Miller v. Glanz, 948 F.2d 1562, 1565 (10th Cir.1991).  Accordingly, all well-pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party. GFF Corp., 130 F.3d at 1384.  "In addition to the complaint, the [C]ourt may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity."  Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002).

Although Plaintiffs' pleadings are to be liberally construed, mere conclusory allegations without supporting factual averments will not suffice,  see Brown v. Zavaras, 63 F.3d 967, 972 (10th Cir. 1995), and the circumstances underlying a fraud claim must be pleaded with particularity.  See Fed. R. Civ. P. 9(b).  A fraud claim must set forth the time,

place, and contents of the false representations, the identity of the party making the false statements, and the consequences thereof.  See Schwartz v. Celestial Seasonings, Inc., 124 F.3d 1246, 1252 (10th Cir. 1997).  A plaintiff must set forth an explanation of what is false or misleading about the statements which form the basis for a fraud claim and why those statements are false.  See Cheng, 184 F.R.D. at 402.  But Rule 9(c) "does not require any particularity in connection with an averment of intent, knowledge or condition of mind." Schwartz, 124 F.3d at 1252.

In applying this rule, "the sufficiency of a complaint must be judged by the complaint in its entirety, rather than in a piecemeal fashion."  Id. at 1253.  Thus, a fraud claim may incorporate other paragraphs in the *Complaint* by reference under Fed. R. Civ. P. 10(c) in order to satisfy the particularity requirements of Fed. R. Civ. P. 9(b).  See Schwartz, 124 F.3d at 1253.  In addition, Plaintiffs may satisfy these requirements by pleading allegations that are "likely to have evidentiary support after a reasonable opportunity for further investigation or discovery," if such allegations are so identified pursuant to Fed. R. Civ. P. 11(b)(3).  See Rotella v. Wood, 528 U.S. 549, 560 (2000) (citing Corley v. Rosewood Care Center, Inc. of Peoria, 142 F.3d 1041, 1050-1051 (7th Cir. 1998)).  If the failure to satisfy the requirements of Fed. R. Civ. P. 9(b) may be cured by an amendment of the pleadings under Fed. R. Civ. P. 15(a), the Court may grant leave to file such a curative amendment in lieu of dismissing the action.  See Cayman Exploration Corp. v. United States Gas Pipe Line Co., 873 F.2d 1357, 1362-63 (10th Cir. 1989); Cheng, 184 F.R.D. at 402.

-14-

A second, distinct standard of review applies to motions to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(2) or for improper venue under Fed. R. Civ. P. 12(b)(3).  See Gulf Ins. Co. v. Glasbrenner, 417 F.3d 353, 355 (2d Cir. 2005) (equating standard of review under Rule 12(b)(3) with standard of review under Rule 12(b)(2)).  When a Court rules on a motion to dismiss for lack of personal jurisdiction or improper venue without conducting an evidentiary hearing, "the plaintiff[s] need only make a prima facie showing of personal jurisdiction [or proper venue] to defeat the motion." OMI Holdings, Inc. v. Royal Ins. Co., 149 F.3d 1086, 1091 (10th Cir. 1998); accord Gulf Ins. Co., 417 F.3d at 355.  Under this standard, Plaintiffs bears the burden of "demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction [and venue] over" a Defendant. OMI Holdings, Inc., 149 F.3d at 1091.  "In order to defeat a plaintiff's prima facie showing of jurisdiction [or venue], a defendant must present a compelling case demonstrating 'that the presence of some other considerations would render jurisdiction [or venue] unreasonable.'" Id. (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985)).

The Court's review of evidence outside the pleadings does not necessarily convert a jurisdictional motion under Fed. R. Civ. P. 12(b) into a motion for summary judgment under Fed. R. Civ. P. 56.  See, e.g., Stuart v. Colo. Interstate Gas Co., 271 F.3d 1221, 1225 (10th Cir. 2001).  Fed. R. Civ. P. 56 provides a more appropriate framework for resolving such issues, however, when a party's jurisdictional challenge relies on evidence outside the pleadings, and "'the jurisdictional question is intertwined with the merits of the case.'"

-15-

Sivoza v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320, 1324 (10th Cir. 2002) (quoting

Wheeler v. Hurdman, 825 F.2d 257, 259 (10th Cir.1987)).

Where the answer to a jurisdictional question relies on evidence outside the pleadings

and is intertwined with the merits of the case, the Court applies a third standard of review.

Under this standard, the Court may enter summary judgment only if the motion papers,

affidavits, and other evidence submitted by the parties show that no genuine issue exists as

to any material fact and that the moving party is entitled to judgment as a matter of law.  See

Fed. R. Civ. P. 56(c).  A "genuine issue" exists where the evidence before the Court is of such

a nature that a reasonable jury could return a verdict in favor of the non-moving party as to

that issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986).  An issue of

fact is "material" if under the substantive law it is essential to the proper disposition of the

claim.  See id. at 248.  Judgment is appropriate "as a matter of law" if the non-moving party

has failed to make an adequate showing on an essential element of its case, as to which it has

the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Adler

v. Wal-Mart Stores, Inc., 144 F.3d 664, 670-71 (10th Cir. 1998).

In order to warrant consideration by the Court, the factual materials accompanying a

motion for summary judgment must be admissible or usable at trial (although they do not

necessarily need to be presented in a form admissible at trial).  See Celotex Corp., 477 U.S.

at 324; Wright-Simmons v. City of Okla. City, 155 F.3d 1264, 1268 (10th Cir. 1998).  "To

survive summary judgment, 'nonmovant's affidavits must be based upon personal knowledge

and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits

-16-

are not sufficient.'" Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995) (quoting Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir.1991)).  Thus, "[h]earsay testimony cannot be considered" in ruling on a summary-judgment motion.  Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995); see also Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995) (applying this rule to inadmissible hearsay testimony in depositions).

Apart from these limitations imposed by the Federal Rules of Evidence, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the admissible evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all admissible evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

Finally, a fourth standard of review applies to motions to transfer venue under 28 U.S.C. § 1404(a).  See Kerobo v. Southwestern Clean Fuels Corp., 285 F.3d 531, 533 (11th Cir. 2002) (distinguishing dismissal for improper venue under Fed. R. Civ. P. 12(b)(3) from transfer of venue under 28 U.S.C. § 1404(a)).  In enacting 28 U.S.C. § 1404(a), Congress intended to give district courts the discretion to transfer cases based on individualized considerations of convenience and fairness. Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988) (citing Van Dusen v. Barrack, 376 U.S. 612, 622 (1964)).  As the grounds for transfers of venue under this statute are "the  convenience of parties and witnesses" and "the

interest of justice," 28 U.S.C. § 1404(a), the district court must necessarily weigh a number

of case-specific factors rather than applying a single bright-line rule.  See id. at 30.

**B.      Plaintiff's Civil RICO Claims**

I next evaluate the legal sufficiency of the civil RICO claims alleged in Plaintiff's

*Complaint*, using the standard of review applicable to motions under Fed. R. Civ. P. 12(b)(6)

and 12(c).  I also apply the particularity requirements of Fed. R. Civ. P. 9(b) in this analysis,

but only to the extent that Plaintiffs allege racketeering activity that is predicated on violations

of the wire, mail, and bank fraud statutes.  See Robbins v. Wilkie, 300 F.3d 1208, 1211 (10th

Cir. 2002); Cayman Exploration Corp., 873 F.2d at 1362.

**1.      Plaintiffs' Standing to Assert Civil RICO Claims**

Defendants contend that Plaintiffs do not have standing to pursue a civil RICO claim

because the *Complaint* does not set forth the alleged damages to Plaintiffs' business or

property with sufficient particularity.  I reject this contention because it does not accord with

the standard of review applicable to a motion filed under Fed. R. Civ. P. 12(b)(6) or 12(c).[1]

To establish standing "[a]t the pleading stage, general factual allegations of injury

resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume

---

[1]In this regard, Defendants' citation to this Court's prior decision in Diaz v. Ledezma, No. Civ. 00-801 MCA/RLP (unpublished memorandum opinion and order filed Aug. 28, 2002), is inapposite.  Diaz involved a motion for default judgment, which necessarily required the plaintiffs to come forward with evidence of their damages before a judgment in their favor could be entered. While other aspects of a civil RICO claim are summarily discussed in that opinion, the plaintiffs' failure to meet their burden of proof as to damages at an evidentiary hearing was the primary reason why their claims were dismissed.

that general allegations embrace those specific facts that are necessary to support the claim."
Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (citations omitted).  "Nothing more
is needed to confer standing on" civil RICO Plaintiffs "at the pleading stage."  NOW v.
Scheidler, 510 U.S. 249, 256 (1994); accord Robbins, 300 F.3d at 1211.  In particular,
Plaintiffs are not required to plead evidence or meet an evidentiary burden in their *Complaint*
in order to establish standing.  See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512-13
(2002).

Moreover, the Court's standing inquiry is not limited to the general allegations
concerning damages and causation set forth in Counts I through IV of the *Complaint*.  These
counts incorporate by reference the earlier allegations in that pleading which contain several
supporting factual averments concerning Plaintiffs' civil RICO claims.  Fed. R. Civ. P. 10(c)
allows Plaintiffs to incorporate these supporting factual averments by reference in order to
establish their standing.  See Schwartz, 124 F.3d at 1253.

Defendants also contend that even if one assumes the truth of all the allegations in the
*Complaint*, Plaintiffs still lack standing because the alleged injury to their business and
property lacks a sufficient causal connection to the alleged racketeering schemes.  While it
is true that causation and injury to business or property form two essential components of
standing to pursue a civil RICO claim under 18 U.S.C. § 1964(c), I do not agree that
Plaintiff's *Complaint* fails to plead these two essential components of standing.

Section 1964(c) of the RICO statute provides that "any person injured in his business
or property by reason of a violation of [S]ection 1962 of this chapter may sue therefor in any

appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."  18 U.S.C. § 1964(c).  The Supreme Court has interpreted this statutory language to include a requirement that plaintiffs must have been "injured" in their "business or property by the conduct constituting the violation" of Section 1962.  Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985).  The Supreme Court also has interpreted the phrase "by reason of" to require that there be a causal connection between the prohibited conduct and the injury to plaintiffs' business or property. See Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268 (1992).

With respect to the injury component of standing, the Supreme Court has rejected the notion that RICO imposes an additional, amorphous requirement of "racketeering injury" or "antitrust injury" that would obligate Plaintiffs to plead something more than "the financial loss stemming from the alleged [predicate] acts of mail and wire fraud."  Sedima, 473 U.S. at 495, 500; Holmes, 503 U.S. at 270 n.15.  While civil RICO damages do not extend to personal injuries suffered by an individual, courts and commentators have recognized several categories of financial losses which may provide a basis for awarding damages to a RICO plaintiff under appropriate circumstances.  These categories may include the return of monies paid, out-of-pocket losses equal to the amount paid minus the value actually received, lost wages, injury to business reputation and loss of good will, lost profits, expenses caused by a defendant's obstruction of justice, business interruption expenses, and expenses for investigations incurred in response to a defendant's racketeering activities.  See generally

-20-

Hon. Jed S. Rakoff & Howard W. Goldstein, RICO Civil and Criminal Law Strategy § 4.02 (2005) (collecting cases).

In addition to the injury component, Section 1964(c) of the RICO statute incorporates the concept of proximate cause, both as a component of standing and as an essential element of a civil RICO claim.  See Trollinger v. Tyson Foods, Inc., 370 F.3d 602, 612-13 (6th Cir. 2004).  For purposes of standing, this concept requires "some direct relation between the injury asserted and the injurious conduct alleged." Holmes, 503 U.S. at 268.  When, as here, RICO claims are asserted in the context of a supplier-purchaser relationship, this requirement generally limits standing to direct purchasers who are defrauded by a supplier.  See id. at 271-72.  Thus, "nonpurchasing customers" and "general creditors" who incur financial losses as the "ripples of harm . . . flow through the Nation's economy" do not have standing because their injuries are derivative and indirect.  Holmes, 503 U.S. at 266 n. 10, 271.

On the other hand, Plaintiffs need not show that Defendants' conduct "was the sole cause of their injury in order to establish proximate cause; they need show only that the conduct was a substantial cause." Trollinger, 370 F.3d at 620.  And where the question of causation does not boil down to a derivative-injury problem, but instead involves a more "traditional proximate-cause problem," such as "a weak or insubstantial causal link, a lack of foreseeability, or a speculative or illogical theory of damages," the issue is better resolved on the merits by means of a summary-judgment motion rather than as a threshold issue at the pleading stage.  See id. at 615.

-21-

For purposes of the threshold standing inquiry at the pleadings stage, I conclude that Plaintiffs' *Complaint* satisfies the requirements of proximate cause and injury to business or property because it alleges that Plaintiffs are direct purchasers who were defrauded by Defendants' activities in advertising, selling, and exporting the SMAW warheads. There is no break in the chain of custody that would create a derivative-injury problem because Plaintiffs' *Complaint* alleges that the SMAW warheads Defendants advertised, sold, and exported to them in 1993 or 1994 are the same devices which the United States Government later seized from Plaintiffs' explosives magazine in New Mexico in 2002. These devices formed the basis for the first of the criminal charges on which Mr. Hudak was indicted and subjected to pretrial detention, as well as the later charge of illegally importing the devices from Canada.

I do not agree with Defendants' assertion that Plaintiffs' decision to import the SMAW warheads back into the United States and store them in an explosives magazine in New Mexico necessarily provides a break in the causal chain between the sale and the seizure. This assertion fails to account for Plaintiffs' allegations that the importation of the SMAW warheads and their storage in New Mexico were conducted in reliance on the "UN numbers" and other documentation that Defendants previously generated for Plaintiffs when arranging to export the devices into Canada. All of the documentation supplied by Defendants allegedly represented that they had the legal right to sell the SMAW warheads to Plaintiffs and that these devices were legal for private parties to possess and to import and export back and forth between the United States and Canada for commercial purposes. The falsehoods or other

-22-

defects in this documentation provided the basis for the charge that Mr. Hudak illegally imported the devices when they were shipped from Canada back into the United States. There is no allegation that Defendants later retracted, limited, or corrected the representations they made in these documents in order to cause this charge to be dismissed.

I also do not agree with Defendants' assertion that the presence of other criminal charges against Mr. Hudak which are unrelated to his possession of the SMAW warheads provides a break in the causal chain that categorically precludes Plaintiffs from linking any of their injuries to Defendants' alleged racketeering activities. This assertion ignores the averments in the *Complaint* which indicate that even if the United States Government had simply decided to seize the SMAW warheads without filing any criminal charges against Mr. Hudak, Plaintiffs still would have lost the use of the warheads themselves. It is reasonable to infer from Plaintiffs' *Complaint* that the financial losses occasioned by the seizure of the SMAW warheads alone could have approximated the $3,300 price that Plaintiffs originally paid for them in 1993 or 1994, plus any overhead costs associated with transporting and storing these devices.

In essence, the fraud allegations in Plaintiffs' *Complaint* assert that Defendants took their money in exchange for a worthless product that Defendants did not have the legal right to sell and that could not be used, possessed, or imported in the United States without subjecting the purchaser to a substantial risk of criminal liability. These allegations do not differ significantly from a garden-variety RICO case in which a supplier is charged with defrauding its customers by means of a racketeering scheme involving the sale of worthless,

nonexistent, overvalued, or defective products.  See, e.g., Sedima, 473 U.S. at 483-84 (alleging a racketeering scheme in which a supplier of electronic components was charged with "presenting inflated bills, cheating Sedima out of a portion of its proceeds by collecting for nonexistent expenses"); Corley, 142 F.3d at 1045-46 (alleging a "bait and switch" scheme involving the sale of nursing-home suites and related services); McCollough v. Suter, 757 F.2d 142, 143 (7th Cir. 1985) (alleging a racketeering scheme in which a supplier provided three rare coins worth less than $10,000 in exchange for a payment of $23,000).

In addition to the loss of the $3,300 purchase price for the SMAW warheads and associated storage and transportation costs, Plaintiffs' *Complaint* alleges other types of damages to business or property that are more directly associated with the seizure of Mr. Hudak's person rather than the seizure of his property.  I agree with Defendants that the issue of damages arising exclusively from Mr. Hudak's arrest and pretrial detention on the criminal charges (as opposed to just the loss of the SMAW warheads) will require closer scrutiny.  To the extent Plaintiffs seek damages for investigation expenses they incurred in responding to Defendants' alleged fraud and obstruction of justice, for example, Plaintiffs would need to distinguish the expenses which are directly related to the SMAW warheads from the expenses associated with defending against the other criminal charges.  Moreover, the fact that Mr. Hudak was eventually charged with crimes unrelated to the SMAW warheads could possibly foreclose Plaintiffs from proving certain types of damages, such as loss of good will or business reputation.

To the extent Plaintiffs are able to prove their allegation that the charge of illegally possessing the SMAW warheads was a substantial cause of Mr. Hudak's initial pretrial detention, however, I cannot rule out the possibility that they might lawfully recover damages for injury to business or property associated with that pretrial detention (such as business interruption expenses and lost income associated with Mr. Hudak's inability to work while in jail). Sorting out the traditional proximate-cause questions associated with determining the scope of damages allegedly stemming from Mr. Hudak's arrest and pretrial detention is better left for later stages of this litigation after the parties have had the opportunity to conduct discovery. See Trollinger, 370 F.3d at 615.

At this preliminary stage where Defendants' motions under Fed. R. Civ. P. 12(b)(6) and 12(c) are limited to challenging the legal sufficiency of the allegations in Plaintiffs' *Complaint*, I conclude that Plaintiffs have alleged at least one form of direct injury to business or property (such as the loss of the use value of the SMAW warheads themselves or the purchase price for these devices) that is sufficient to satisfy the threshold requirements for standing to sue under 18 U.S.C. § 1964(c). I therefore proceed to the analysis of whether Plaintiffs' *Complaint* pleads a substantive violation of the RICO statute.

## 2.   Plaintiffs' Allegations of Substantive RICO Violations

In addition to meeting the standing requirements of 18 U.S.C. § 1964(c), Plaintiffs' *Complaint* must allege each of the essential elements of a substantive RICO violation under 18 U.S.C. § 1962. Although Section 1962 lists four different types of RICO violations, only two of them are relevant here: Sections 1962(c) and (d). Section 1962(c) makes it is

unlawful for any person to conduct an enterprise through a pattern of racketeering activity, while Section 1962(d) prohibits any person from conspiring to violate the provisions of Section 1962(c). See 18 U.S.C. §§ 1962(c), (d). Inasmuch as the alleged conspiracy charge under Section 1962(d) requires an agreement to violate Section 1962(c), my discussion begins with the elements of a claim under the latter provision of the statute.

In order to state a RICO claim under 18 U.S.C. § 1962(c), Plaintiffs' *Complaint* must set forth five elements: (1) participation in conduct (2) of an enterprise (3) through (4) a pattern (5) of racketeering activity. See Garrett v. Selby Connor Maddux & Janer, 425 F.3d 836, 838 (10th Cir.2005); Bancoklahoma Mortgage Corp. v. Capital Title Co., 194 F.3d 1089, 1100 (10th Cir.1999); United States v. Smith, 413 F.3d 1253, 1266-67 (10th Cir. 2005). Because the definitions of some of these elements are interrelated, I will discuss the fifth, fourth, and second elements in that order and then conclude my analysis with a combined discussion of the first and third elements.[2]

### a.    Racketeering Activity

In order to meet the definition of "racketeering activity," Plaintiffs' *Complaint* must set forth "predicate acts" which consist of the federal and state crimes identified in 18 U.S.C. § 1961(1). A person does not have to be formally convicted of these predicate acts, however,

---

[2]RICO claims under Section 1962(c) are sometimes analyzed in terms of four elements rather than five, see, e.g., Bancoklahoma Mortgage Corp., 194 F.3d at 1100, and the enterprise's effect on interstate or foreign commerce is sometimes treated as a separate element, see, e.g., Smith, 413 F.3d at 1266. In this case, I have chosen to group the elements as listed above because the interstate or foreign commerce element is not seriously in dispute at this juncture, and because the "through" or "nexus" element requires additional analysis here. See id. at 1272.

before liability under 18 U.S.C. § 1962(c) may attach.  See Sedima, 473 U.S. at 491-93; Bancoklahama Mortgage Corp., 194 F.3d at 1102.

In this case, Plaintiffs allege predicate acts consisting of mail or wire fraud, bank fraud, interstate transportation of stolen property, and obstruction of justice.  18 U.S.C. § 1961(1) recognizes each of these predicate acts as a legally sufficient element of a RICO claim.  While I conclude that bank fraud does not apply as a predicate act under the circumstances alleged here, I also conclude that Plaintiffs' *Complaint* properly alleges each of the essential elements of the predicate acts of mail fraud, wire fraud, interstate transportation of stolen property, and obstruction of justice.

### i.      Mail and Wire Fraud

Generally, the concept of "fraud" includes the following elements:  "(1) a representation;  (2) that is false;  (3) that is material;  (4) the speaker's knowledge of its falsity or ignorance of its truth;  (5) the speaker's intent it be acted on;  (6) the hearer's ignorance of the falsity of the representation;  (7) the hearer's reliance;  (8) the hearer's right to rely on it;  and (9) injury."  Bancoklahoma Mortgage Corp., 194 F.3d at 1103.  In order to qualify as a predicate act of "racketeering activity" for purposes of a RICO claim, however, the type of fraud alleged in this case must meet the specific statutory definitions set forth in 18 U.S.C. § 1961(1).

RICO's definition of "racketeering activity" specifically includes "mail fraud, wire fraud, and bank fraud."  Bancoklahoma Mortgage Corp., 194 F.3d at 1092 (citations omitted). The essential elements of a predicate act of mail fraud are  "(1) the existence of a scheme or

artifice to defraud or obtain money or property by false pretenses, representations or promises, and (2) use of the United States mails for the purpose of executing the scheme." Id. (quoting  Bacchus Indus. v. Arvin Indus., 939 F.2d 887, 892 (10th Cir. 1991).   "The elements of wire fraud are very similar, but require that the defendant 'use interstate wire, radio or television communications in furtherance of the scheme to defraud.'"  Id. (quoting Bacchus, 939 F.2d at 892).

Under these statutory definitions, fraud is not limited to communications which precede the date on which victims lose their money or begin to suspect that they have been defrauded.  Rather, mailings or wire communications which occur after that date are still in furtherance of the scheme to defraud if they facilitate concealment or postpone investigation of that scheme, as "when they help cloak the scheme with an aura of legitimacy, thereby preventing its detection and allowing it to continue."  United States v. Lack, 129 F.3d 403, 407 (7th Cir. 1997); see Corley, 142 F.3d at 1057 (collecting mail fraud cases and applying them to a civil RICO claim).

For these reasons, Plaintiffs' allegations of mail and wire fraud may extend not only to the communications which induced them to purchase the SMAW warheads, but also to other communications in furtherance of Defendants' alleged scheme.  In particular, such communications may include those directed at customs officials associated with exporting the SMAW warheads to Canada, as well as subsequent responses to inquiries after Mr. Hudak was arrested and began to suspect that he and his company had been defrauded.

With respect to each such occurrence, Plaintiffs must plead the elements of wire and mail fraud with particularity in their *Complaint* in order to satisfy Fed. R. Civ. P. 9(b). Generally, this means Plaintiffs must set forth the time, place, and contents of the false representations, the identity of the party making the false statements, and the consequences thereof in a manner sufficient to explain what is false or misleading about the statements and why those statements are false. See Schwartz, 124 F.3d 1246, 1252 (10th Cir. 1997); Cheng, 184 F.R.D. at 402.

Plaintiffs' *Complaint* meets these requirements in most respects. Specifically, Paragraphs 125 and 139 of the *Complaint* provide tables which identify the speaker or writer, list the time and contents of allegedly false statements, and specify whether the statement was communicated through the use of the United States mails or by means of interstate wire communications. The place of these statements, as well as the interstate nature of the wire communications, can be reasonably inferred from Paragraphs 2, 3, 5, 6, 23, 33, 55, 70, 71, 85, 94, and 95 of the *Complaint*, which identify Plaintiffs' location in Canada, the location of JRC and HESI in or around Swannanoa, North Carolina, and the location of Mr. Sonday and Accurate in or around Nashville, Tennessee.

Paragraphs 44 through 111, 123, and 136 of the *Complaint* also explain in great detail what Plaintiffs allege to be false about the statements and why. Specifically, Plaintiffs allege that throughout their communications Defendants represented the SMAW warheads as demilitarized demolition charges with a UN Number of "UN0048," when in fact these devices remained military weapons belonging to the United States Government and could not be

lawfully sold or shipped across the border for commercial purposes.  Paragraphs 57, 63, 69, 75, 76, 93, 98, 99, 100 of the *Complaint* further allege that Defendants' false representations to this effect were material to the purchase of the SMAW warheads, as well as their export and import back and forth across the border, because Plaintiffs relied on these representations and would not have made the purchase had they known of its illegality.  These paragraphs of the *Complaint* also allege that the SMAW warheads would not have been allowed to cross the border if they had been described accurately, because the parties did not qualify for the licenses required for importation of these devices.

Paragraphs 18 through 22, 27 through 32, 38, 43, 55, 56, 96, 98, 99, 100, and 103 of Plaintiffs' *Complaint* explain the basis for their reliance on Defendants' representations, namely the relationship of trust and good will that Defendants JRC and HESI had established in their past dealings with Plaintiffs, and the extension of this relationship to Mr. Sonday and Accurate as a result of their association with JRC, HESI, and the larger network of established defense contractors to which JRC and HESI belonged.  Paragraphs 101 through 106, 119 and 120 of Plaintiffs' *Complaint* sets forth the adverse consequences of the false statements attributed to Defendants, namely the seizure of the SMAW warheads and Mr. Hudak's person, and the ensuing damage to Plaintiffs' business.  Finally, Paragraphs 33, 35, 39, 41, 42, 47, 52, 53, 62, 68, 74, 79, 81, 89, 100, 103, 111, 112, 116, 117, and 118 of Plaintiffs' *Complaint* generally allege the elements of intent, knowledge, or state of mind necessary to support their wire and mail fraud claims, and these elements are not required to be pleaded with particularity under Fed. R. Civ. P. 9(b).  See Schwartz, 124 F.3d at 1252.

Defendants contend that despite all of the specific allegations cited above, there remain a small number of allegations for which Plaintiffs have not yet identified the exact date, author, and content of the statement in question.  For example, Defendant HESI points out that Paragraph 75 of Plaintiffs' *Complaint* does not specifically identify the communication that HESI personnel allegedly provided in response to the Canadian government's query of March 1, 1994, regarding the permit application for exporting the SMAW warheads under UN Number 0048.  And, Paragraphs 112 through 115 of Plaintiffs' *Complaint* do not specifically identify each particular transaction in which Defendants are alleged to have sold SMAW warheads or other unauthorized devices to other unknowing purchasers.

I conclude that these few omissions do not justify dismissing Plaintiffs' *Complaint* under Fed. R. Civ. P. 12(b)(6) or granting judgment on the pleadings under Fed. R. Civ. P. 12(c) as to any Defendant.  The requirements for pleading a fraud claim with particularity under Fed. R. Civ. P. 9(b) may be relaxed when a plaintiff provides a sufficient explanation as to why the omitted details are within the exclusive knowledge or control of an opposing party.  See Scheidt v. Klein, 956 F.2d 963, 968 (10th Cir.1992).  Similarly, Fed. R. Civ. P. 11(b)(3) permits an attorney to plead and identify allegations that are "likely to have evidentiary support after a reasonable opportunity for further investigation or discovery."  See Rotella, 528 U.S. at 560;  Corley, 142 F.3d at 1050-1051.

As in Scheidt, 956 F.2d at 968, "Plaintiffs' pleadings begin with a lengthy and detailed factual recitation thoroughly setting out the circumstances giving rise to their fraud claims."  This recitation allows the Court and the parties to pinpoint the areas of further investigation

or discovery that are likely to yield evidentiary support for the allegation that HESI made fraudulent statements to Canadian customs officials as well as the allegations concerning fraudulent sales of SMAW warheads or similar devices to other unsuspecting purchasers in the private sector.    Plaintiffs' *Complaint* attempts to particularize the fraudulent communication that HESI allegedly sent to Canadian customs officials by identifying the request from Canadian customs officials which prompted that communication, as well as the ensuing action by these customs officials which was allegedly taken in reliance on that communication.   [Doc. 1, at ¶¶ 73, 74, 75.]   Plaintiffs also specify a likely source of evidentiary support for their contention that Defendants engaged in other fraudulent sales of SMAW warheads or similar devices by pointing to the testimony of Defendants' former agents or employees during Mr. Hudak's criminal trial.  [Doc. 1, at ¶ 113.]  Plaintiffs further explain in their pleading why the omitted details of these allegedly fraudulent communications are outside their knowledge and control, reciting their efforts to obtain relevant information from Defendants in order to exonerate Mr. Hudak and secure his release while the criminal charges were pending, as well as Defendants' responses denying access to this information and stating that the company records had been destroyed.  [Doc. 1, at ¶¶ 103, 107, 108, 109, 110, 111.]

I conclude that these allegations place Plaintiffs' *Complaint* in substantially the same procedural posture as the pleading at issue in <u>Corley</u>, 142 F.3d at 1050-1051.  In that case, the Seventh Circuit concluded that the plaintiffs, who allegedly were victims of a nursing home's "bait and switch" scheme, sufficiently pleaded the mail and wire fraud elements of

a civil RICO claim even though their pleading lacked certain details about allegedly fraudulent statements to other nursing-home residents who were victims of the identical "bait and switch" scheme.   The Seventh Circuit excused this lack of detail on the grounds that, at the time the complaint was filed, the plaintiffs "had been denied access in discovery to information that would identify those residents."  Id. at 1051.  The Supreme Court later cited Corley with approval in Rotella, 528 U.S. at 560.[3]  Based on these authorities, I conclude that Plaintiffs' *Complaint* sufficiently pleads each of the essential elements of wire and mail fraud.

### ii.     Bank Fraud

Plaintiffs also allege that Defendant Accurate engaged in the predicate act of bank fraud because Plaintiffs' $3,300 payment for the SMAW warheads in 1994 was deposited in Accurate's account with the Third National Bank in Nashville, Tennessee.  The elements of bank fraud are modeled on the mail and wire fraud statutes and include:

> "(1) that the defendant knowingly executed or attempted to execute a scheme (i) to defraud, or (ii) to obtain property by means of false or fraudulent pretenses, representations or promises;  (2) that defendant did so with the intent to defraud; and (3) that the financial institution was then insured by the Federal Deposit Insurance Corporation."

Bancoklahoma Mortgage Corp., 194 F.3d at 1102-03 (quoting United States v. Rackley, 986 F.2d 1357, 1360-61 (10th Cir.1993)).  In contrast to the crimes of mail and wire fraud, however, the bank fraud statute does not "cover situations where money is merely withdrawn

---

[3]After the case was remanded to the district court, the plaintiff who resided in the nursing home died, and the district court eventually granted summary judgment to the nursing-home defendants after the completion of discovery.  See Corley v. Rosewood Care Ctr., Inc., 152 F. Supp. 2d 1099 (C.D. Ill. 2001), aff'd, 388 F.3d 990 (7th Cir. 2004).

legally from a federally insured bank by a victim and where the bank itself is in no way victimized." <u>United States v. Blackmon</u>, 839 F.2d 900, 904 (2d Cir.1988). "Thus, to take money in the custody of a bank is not a crime under the statute unless there is a concomitant intent to victimize the bank" by exposing the bank to an actual or potential loss. <u>United States v. Thomas</u>, 315 F.3d 190, 198 (3d Cir. 2002); <u>see</u> <u>United States v. Rodriguez</u>, 140 F.3d 163, 168 (2d Cir. 1998).

The allegations of Plaintiffs' *Complaint* fail to meet this test because they do not state how Accurate or the other Defendants intended to victimize the bank in which Plaintiff's check was deposited. At best, the bank appears to be nothing more than an unknowing intermediary through which Accurate or other Defendants channeled the $3,300 payment that they fraudulently obtained from Plaintiffs. To the extent that the bank was exposed to any potential loss as a result of this transaction, that loss would seem to constitute a derivative and indirect injury which is insufficient to support a civil RICO claim under <u>Holmes</u>, 503 U.S. at 266 n. 10, 271. For these reasons, I conclude that bank fraud cannot be used as a predicate act to support Plaintiffs' civil RICO claims at this juncture.[4]

_____

[4]This conclusion is not dispositive, of course, because I also conclude that there are other predicate acts which can support Plaintiffs' civil RICO claims against each Defendant. In addition, my conclusion as to Plaintiffs' bank fraud allegations does not necessary preclude Plaintiffs from seeking leave to amend their pleading with more specific information that could support a bank-fraud theory. See <u>Cayman Exploration Corp.</u>, 873 F.2d at 1362-63; <u>Cheng</u>, 184 F.R.D. at 402.

-34-

### iii.   __Interstate Transportation of Stolen Property__

Plaintiffs' *Complaint* also alleges the crime of interstate transportation of stolen property as a predicate act which supports their civil RICO claims against Defendants. There are four elements to this crime: "(1) the defendants transported goods in interstate commerce; (2) the value of the goods was $5,000 or more; (3) the goods were stolen; and (4) the defendants knew the goods were stolen at the time of the transportation." United States v. Tasy, 203 F.3d 1060, 1062 (8th Cir. 2000). "[I]t is not necessary to show that the goods were actually stolen by the defendants or that the transportation was personally effected by the defendants. A violation exists when the evidence reveals the defendants were simply a motivating force in the transportation of the stolen goods." Id.

In this case, there is no question that the SMAW warheads that Defendants shipped from the Swannanoa facility in North Carolina must have traveled in interstate commerce before they reached Plaintiffs' explosives magazine in Canada. For purposes of evaluating Defendants' motions under Fed. R. Civ. P. 12(b)(6) and 12(c), I also must accept as true Plaintiffs' allegations that this shipment of SMAW warheads consisted entirely of stolen government property and that Defendants, through their sales efforts, were the motivating force behind this shipment.

At this juncture, the issue in dispute is whether there is any version of the facts under which a factfinder could reasonably infer that the value of the SMAW warheads Defendants shipped to Plaintiffs was $5,000 or more. Defendants contend that Plaintiffs' *Complaint* provides no rational grounds on which such a value could be attributed to these devices

because Plaintiffs allegedly paid only $3,300 for them and, according to some of Plaintiffs' fraud theories, the SMAW warheads were in fact worthless in any legitimate commercial market in light of their potential for seizure and criminal prosecution by the United States Government.

I agree with Defendants that some of Plaintiffs' allegations regarding the predicate act of interstate transportation of stolen property may be inconsistent with some of their fraud theories, under which the SMAW warheads are alleged to have no value at all in a legitimate commercial market. I will, however, liberally construe Plaintiffs' *Complaint* as pleading the theory of interstate transportation of stolen property in the alternative.[5] That is, Plaintiffs may plead an alternative theory under which the sale of the SMAW warheads was fraudulent because Defendants failed to disclose that these devices were stolen from the United States Government, but the elements of interstate transportation of stolen property are still met inasmuch as the devices had a discernible value greater than $5,000 in a "thieves market."

Under such a theory, the $5,000 value element of the crime of interstate transportation of stolen property "may be proved by evidence of the stolen property's value either at the time of theft or at the time of transportation." United States v. Moore, 571 F.2d 154, 156 (3d Cir. 1978). Thus, a product having a value of less than $5,000 at the time it is stolen may, nevertheless, satisfy the $5,000 threshold if something has been done to enhance its value at the time it is transported across state lines. See, e.g., id. at 157 (affirming convictions of

---

[5]Pleading in the alternative is expressly permitted by Fed. R. Civ. P. 8(e)(2).

defendants who transported more than $5,000 worth of counterfeit tickets across state lines even though the blank forms on which the counterfeiters printed the tickets were worth only $51.74 at the time they were stolen).  And conversely, an item may meet the $5,000 threshold because of its value at the time of the theft even though it is sent to a recipient free of charge at the time it crosses state lines.  See, e.g., United States v. Stegora, 849 F.2d 291, 292 (8th Cir. 1988) (affirming convictions of a defendant who sent letters enclosing samples of stolen material at no charge to the recipient).

Here one can reasonably infer a scenario under which the stolen warheads had a value greater than $5,000 at the time of the alleged theft even though Plaintiffs only agreed to pay $3,300 for them at the time they crossed state lines on their way to Canada.  "Ordinarily, market value is used to determine the value of the stolen property." Stegora, 849 F.2d at 292.  But where "'an exceptional type of goods that has no market value'" is at issue, "'any reasonable method may be employed to ascribe an equivalent monetary value to the items.'" Id. (quoting United States v. Lester, 282 F.2d 750, 755 (3d Cir. 1960)).  In such instances, "development and production costs as well as revenues may be considered," and courts also have approved "the use of a thieves' market as a proper means of valuing stolen goods." Id. (citations omitted).

Stegora, for example, involved the theft and interstate transportation of samples of a synthetic casting material that 3M Company had recently developed but which had not yet been patented and released into the marketplace.  See id. at 292.  While there was not yet an established market value for end-users who might have used the samples for making casts to

repair broken bones, the Eighth Circuit nevertheless considered the cost 3M Company had expended for research, development, and manufacturing equipment for its new casting material, as well as the value of the samples in a "thieves market" consisting of 3M's competitors, who could benefit from the opportunity to access this product before it was patented and released for commercial use.  See id.

The SMAW warheads at issue in Plaintiffs' *Complaint* are analogous to the samples of synthetic casting material in Stegora.  Calculation of their value at the time they allegedly were stolen may take into consideration research and development costs, as well as the price a foreign government or other competitor in the arms race would be willing to pay in a "thieves market."  At the pleading stage, it is not unreasonable to infer that such calculations could result in an aggregate value for one shipment that is greater than $5,000.  The fact that Defendants ultimately decided to sell the SMAW warheads for a lesser price to one or more commercial end-users at the time they were transported across state lines does not necessarily preclude Plaintiffs from asserting a theory based on a greater value at the time of the theft. See Moore, 571 F.2d at 156 (concluding that the $5,000 requirement may be satisfied by evidence of the stolen property's value at the time of theft or at the time of interstate transportation); Stegora, 849 F.2d at 292 (affirming convictions where more than $5,000 worth of stolen materials were sent to recipients free of charge).

Although each interstate shipment of SMAW warheads must be considered separately for purposes of this crime, see generally United States v. Johnpoll, 739 F.2d 702, 714 (2d Cir. 1984), similar principles would apply to each of the other illegal sales that Plaintiffs' allege

-38-

in their *Complaint*.  For these reasons, I conclude that Plaintiffs' *Complaint* sets forth all the elements of the predicate act of interstate transportation of stolen property for purposes of their civil RICO claims.

### iv.   <u>Obstruction of Justice</u>

The final category of predicate acts that Plaintiffs assert in their *Complaint* consists of obstruction of justice under 18 U.S.C. § 1512.  This statute was amended by the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 1102, 116 Stat. 745, 807 (2002), which was enacted in the wake of a number of highly publicized corporate scandals and cover-ups. <u>See generally</u> William S. Duffey, Jr., <u>Corporate Fraud and Accountability:  A Primer on the Sarbanes-Oxley Act of 2002</u>, 54 S.C.L. Rev. 405, 406 (2002).  One of these highly publicized scandals involved the Enron Corporation, and the Supreme Court recently addressed the sufficiency of jury instructions concerning an obstruction of justice charge arising out of that scandal.  <u>See</u> <u>Arthur Andersen v. United States</u>, 125 S. Ct. 2129 (2005).   The provision of the statute at issue in <u>Arthur Andersen</u>, however, predates the Sarbanes-Oxley Act of 2002.

The effective date of the 2002 amendments to the obstruction of justice statutes occasioned by the Sarbanes-Oxley Act is July 30, 2002.[6]  <u>See</u> Pub. L. No. 107-204, § 1107. The relevant provisions of 18 U.S.C. § 1512, as amended in 2002, establish criminal penalties for a person who "corruptly . . . alters, destroys, mutilates, or conceals a record, document,

---

[6]The Sarbanes-Oxley Act has other, related provisions regarding the obstruction of justice. <u>See, e.g.</u>, 18 U.S.C. § 1519.  I do not consider other new provisions at this time because they do not appear to have been listed in the RICO statute's definition of "racketeering activity" during the relevant time frame.  <u>See</u> 18 U.S.C. § 1961(1)(prior to 2002 amendment).

or other object, or attempts to do so, with the intent to impair the object's integrity or

availability for use in an official proceeding;  or . . . otherwise obstructs, influences, or

impedes any official proceeding, or attempts to do so."  18 U.S.C. § 1512(c).

Even before the 2002 amendment, the statute applied to a person who

> knowingly uses intimidation, threatens, or corruptly persuades another person,
> or who attempts to do so, or engages in misleading conduct toward another
> person, with intent to--
>  (1) influence, delay, or prevent the testimony of any person in an official
> proceeding;
>  (2) cause or induce any person to--
>  (A) withhold testimony, or withhold a record, document, or other object, from
> an official proceeding;
>  (B) alter, destroy, mutilate, or conceal an object with intent to impair the
> object's integrity or availability for use in an official proceeding;
>  (C) evade legal process summoning that person to appear as a witness, or to
> produce a record, document, or other object, in an official proceeding;  or
>  (D) be absent from an official proceeding to which such person has been
> summoned by legal process;  or
>  (3) hinder, delay, or prevent the communication to a law enforcement officer
> or judge of the United States of information relating to the commission or
> possible commission of a Federal offense or a violation of conditions of
> probation, supervised release, parole, or release pending judicial proceedings.

18 U.S.C. § 1512(b).  For purposes of this section, an "official proceeding" includes "a

proceeding before a judge or court of the United States ... or a Federal grand jury."  18 U.S.C.

§ 1515(a)(1)(A).

Interpreting the version of the statute in effect prior to the Sarbanes-Oxley Act, the

Supreme Court concluded that Congress' conjunctive use of the terms "knowingly" and

"corruptly" in Section 1512(b)(2) is meant to convey an element of "conscious ...

wrongdoing," with the "specific intent to subvert or undermine the integrity" of a federal

proceeding. 125 S.Ct. at 2136.  Arthur Andersen, 125 S. Ct. at 2136.  The Supreme Court further concluded that a conviction under Section 1512(b)(2) requires a nexus between the defendant's knowing, corrupt act and the official proceeding which that act obstructs.  See id. at 2137 (citing United States v. Aguilar, 515 U.S. 593, 599-600 (1995)).  "'[I]f the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, . . . he lacks the requisite intent to obstruct.'"  Id. (quoting Aguilar,  515 U.S. at 599).

The Supreme Court felt the need to stress these requirements of Section 1512(b)(2) in Arthur Andersen because otherwise the broadly and literally worded language of the trial court's jury instructions in that case could lead to an absurd result in which persons are convicted of obstruction of justice for asserting their constitutional rights or honestly counseling another person to act within their rights, as when a witness asserts his or her Fifth Amendment privilege on advise of counsel and refuses to testify or give a statement to investigators.  Consistent with this reasoning, I do not construe Plaintiffs' *Complaint* as alleging, for example, that Mr. Sonday or other potential witnesses obstructed justice merely by declining to testify at Mr. Hudak's criminal trial.  Rather, I understand Plaintiffs to be alleging that Defendants obstructed justice by engaging in affirmative conduct, such as tampering with evidence or giving false statements with the intent to conceal criminal behavior that would otherwise come to light in a court proceeding.

In this regard, the Tenth Circuit recently affirmed a conviction under 18 U.S.C. § 1512(b)(3) involving a corrections officer who knowingly supplied false information on a report and presented false information to New Mexico police in order to conceal the

misconduct of other officers in the beating of a prisoner.   See United States v. Serrata, 425 F.3d 886, 897 (10th Cir. 2005).  Neither Section 1512(b)(3) of the statute nor the trial court's jury instructions in that case presented the absurd result contemplated in Arthur Andersen.[7]

In Serrata, the corrections officer contended that his conviction for obstruction of justice under Section 1512(b)(3) could not stand because "he did not know or believe that the information he provided would be transmitted to federal authorities," and his only intent was to "'to prevent retaliation against himself by the prison management,' not to hinder or delay a federal investigation." Id. at 897.  The Tenth Circuit rejected these contentions, concluding that Section 1512(b)(3) did not require knowledge that the false information would be supplied to federal authorities rather than state police, or that a federal investigation or proceeding was actually pending or imminent at the time.  Rather, this provision of the statute only required that there was a possible federal crime involved, that the defendant's false statements were intended to thwart an inquiry into that crime by a law enforcement agent (whether local, state, or federal), and that there was a reasonable possibility or likelihood that the false information would be transmitted to federal authorities.  See id. (collecting cases).

Serrata provides support for a colorable claim that Defendants engaged in the predicate act of obstructing justice when they allegedly supplied false information (such as the UN

_____

[7]The Tenth Circuit's Serrata opinion does not expressly discuss the Supreme Court's Arthur Andersen opinion; however, the First Circuit recently addressed the impact of Arthur Andersen's interpretation of Section 1512(b)(2) on earlier precedent regarding Section 1512(b)(3). See United States v. Byrne, 435 F.3d 16, 22-25 (1st Cir. 2006).  Byrne suggests that Serrata's interpretation of Section 1512(b)(3) is still good law notwithstanding Arthur Andersen's interpretation of Section 1512(b)(2).

-42-

Number 0048) knowing that information would be transmitted to customs officials for the export of the SMAW warheads to Canada in 1994. According to Plaintiffs' *Complaint*, the act of appropriating the Government's warheads for private sale and then exporting them to Canada without an appropriate license would constitute federal offenses, and Defendants' misleading statements about the nature of the devices they were exporting were made with the knowledge and intent to hinder, prevent, or delay communications to federal customs officials who otherwise would have been alerted to the possible commission of such offenses. Thus, like the corrections officer's false statements to police investigators in <u>Serrata</u>, it is arguable that Defendants' actions constituted "misleading conduct with the intent to . . . hinder, delay, or prevent the communication to a law enforcement officer . . . of the United States of information relating to the commission or possible commission of a Federal offense." 18 U.S.C. § 1512(b)(3); <u>see</u> <u>Serrata</u>, 425 F.3d at 897.

Moreover, the main focus of Plaintiffs' allegations regarding obstruction of justice is on the subsequent conduct of Defendants in responding to queries about the origin of the SMAW warheads that law enforcement agents seized from Plaintiffs' explosives magazine when Mr. Hudak was arrested in August 2002. From the time of Mr. Hudak's arrest, there is no question that there was an "official proceeding" already underway for purposes of 18 U.S.C. § 1512(c), and the broader provisions of the Sarbanes-Oxley Act of 2002 had taken effect.

The parties do not point to any authority from the Supreme Court and the Tenth Circuit interpreting 18 U.S.C. § 1512(c) as amended by the Sarbanes-Oxley Act of 2002. There is,

however, a recent district court opinion concluding that to sustain a conviction under the 2002 version section 1512(c)(1), a prosecutor must prove two elements:  "(1) that the defendant corruptly concealed, or attempted to conceal a record, document, or other object, and (2) that the defendant did so with the specific intent of making the record, document, or other object unavailable for use at an official proceeding."   United States v. Ortiz, 367 F. Supp. 2d 536, 543 (S.D.N.Y. 2005).  Even if one construes the new Section 1512(c) more narrowly in order to avoid any potential conflict with the principles articulated in Arthur Andersen, Plaintiffs' *Complaint* would satisfy such a narrow construction because it also alleges the requisite mental state of conscious wrongdoing and an obvious nexus to a federal proceeding or investigation.

In particular, Plaintiffs' *Complaint* alleges that Defendants knew of the pendency of the Government's criminal prosecution of Mr. Hudak based on the queries for information about the SMAW warheads that they received during this prosecution.  Plaintiffs further allege that, notwithstanding this knowledge, Defendants engaged in conscious wrongdoing by destroying or altering records, documents, or other objects with the specific intent of making these items unavailable for use in Mr. Hudak's criminal trial or related proceedings. In addition, Plaintiffs allege that Defendants made false statements denying any knowledge of, or involvement in, the sale of the SMAW warheads to Plaintiffs or others.  [Doc. 1, at ¶¶ 103 and 107 through 111.] For purposes of defeating Defendants' motions under Fed. R. Civ. P. 12(b)(6) and 12(c), I conclude that these allegations of obstruction of justice, combined with Plaintiffs' allegations of mail fraud, wire fraud, and interstate transportation of stolen

-44-

property, are legally sufficient to support the predicate acts of racketeering activity which form the basis for Plaintiffs' civil RICO claims.

### b. **Pattern**

Simply alleging one or more of the predicate acts listed in 18 U.S.C. § 1961(1) is not enough to establish a civil RICO violation under 18 U.S.C. § 1962(c).  Plaintiffs' *Complaint* also must explain how these acts combined to form "a pattern of racketeering activity." Garrett, 425 F.3d at 838.  Such a pattern must include commission of at least two predicate acts within a ten-year period "which amount to, or otherwise constitute a threat of continuing racketeering activity by the enterprise" in which Defendants participated.[8]  Bacchus Indus., 939 F.2d at 891; see Duran v. Carris, 238 F.3d 1268, 1271 (10th Cir. 2001).

"To satisfy the pattern requirement of RICO, plaintiffs must show two elements--'continuity plus relationship.'"  Boone v. Carlsbad Bancorporation, Inc., 972 F.2d 1545, 1555 (10th Cir.1992) (quoting Sedima, 473 U.S. at 496 n. 14).   The relationship test "'is not a cumbersome one for a RICO plaintiff.'"   Id. (quoting Feinstein v. RTC, 942 F.2d 34, 44 (1st Cir.1991)).  "A showing that predicate acts 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not  isolated events' is essentially all that is needed" to satisfy the relationship test. Feinstein, 942 F.2d at 44 (quoting H.J. Inc. v. Northwestern Bell

---

[8]The focus of the present discussion is on the meaning of the word "pattern" as it  appears in Section 1962(c) of the RICO statute.  The meaning of the word "through" is addressed separately in my subsequent discussion of whether Defendants "participated in the conduct" of a RICO "enterprise."

Telephone Co., 492 U.S. 229, 240 (1989)); see Corley, 142 F.3d at 1048-49 (listing similar factors to be considered in determining whether a closed-ended pattern of racketeering is established).

To satisfy the continuity requirement, however, Plaintiffs also must show "either 'a closed period of repeated conduct' or 'past conduct that by its nature projects into the future with a threat of repetition.' ...  These two forms of continuity are respectively referred to as closed-ended and open-ended continuity."  Boone, 972 F.2d at 1555 (quoting  Phelps v. Wichita-Eagle Beacon, 886 F.2d 1262, 1273 (10th Cir.1989)).  "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time."  RTC v. Stone, 998 F.2d 1534,  1543 (10th Cir. 1993).  "Open-ended continuity depends upon the facts of each case, and may be established by showing that the predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit, or that the predicates are a regular way of conducting the defendant's ongoing legitimate business or the RICO enterprise."  Id.;  accord Corley, 142 F.3d at 1049.

In the Tenth Circuit, two factors are particularly relevant to the determination of continuity:  (1) "the duration of the related predicate acts," and (2) "the extensiveness of the RICO enterprise's scheme."  Stone, 998 F.2d at 1543.  The extensiveness of a scheme is evaluated by reference to a number of additional factors, including the number of victims, the number and variety of the racketeering acts, whether the injuries caused were distinct, the

complexity and size of the scheme, and the nature or character of the enterprise or unlawful activity.  Id. at 1543-44.

In this case, Defendants contend that the *Complaint* does not sufficiently allege a pattern of racketeering activity because, in their view, Plaintiffs' dispute only concerns a single shipment of products in 1994, and that dispute came to an end no later than the time of Mr. Hudak's acquittal in 2003.  To support this view, Defendants attempt to compare this case to others in which the Tenth Circuit concluded that a plaintiff's civil RICO allegations boiled down to nothing more than "a closed-ended series of predicate acts constituting a single scheme ... to accomplish a discrete goal ... directed at a finite group of individuals ... 'with no potential to extend to other persons or entities.'"  Boone, 972 F.2d at 1556 (quoting Sil-Flo, Inc. v. SFHC, Inc., 917 F.2d 1507, 1516 (10th Cir.1990)); see Duran, 238 F.3d at 1271.

Applying the standard that I am required to follow in reviewing dispositive motions under  Fed. R. Civ. P. 12(b)(6) and 12(c), I cannot agree with Defendants' narrow view that Plaintiffs' civil RICO claims boil down to an isolated and closed dispute over a single shipment of products in 1994.  At this preliminary juncture, the Court's task is "not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  Miller, 948 F.2d at 1565.  Accordingly, I must accept all well-pleaded factual allegations in Plaintiffs' *Complaint* as if they are true and view those allegations in the light most favorable to Plaintiffs.  See GFF Corp., 130 F.3d at 1384.

-47-

Viewing Plaintiffs' allegations in this light, I conclude that they are legally sufficient to satisfy the requirements for showing a "pattern of racketeering" at the pleading stage. The numerous predicate acts of mail fraud, wire fraud, interstate transportation of stolen property, and obstruction of justice alleged in Plaintiffs' *Complaint* "'are interrelated by distinguishing characteristics and are not isolated events.'" Feinstein, 942 F.2d at 44 (quoting H.J. Inc., 492 U.S. 229, at 240). These predicate acts share the same purposes or results of (1) inducing Plaintiffs and others to purchase and pay for the SMAW warheads and to export them across the border with Canada under false pretenses, (2) concealing the true nature and legal status of Defendants' stockpile of SMAW warheads from Plaintiffs, Canadian customs officials, the United States Government, and others; and (3) obstructing the investigation of past sales of SMAW warheads or similar devices when the sale to Plaintiffs came to light during Mr. Hudak's criminal prosecution. As noted in my previous discussion of the predicate acts of mail and wire fraud, the allegedly fraudulent communications to Canadian customs officials in 1994 and in response to inquiries received after Mr. Hudak was arrested in 2002 relate back to the earlier scheme to sell the SMAW warheads because these communications "help cloak the scheme with an aura of legitimacy, thereby preventing its detection and allowing it to continue." Lack, 129 F.3d at 407.

As for the element of continuity, Plaintiffs allege both closed-ended and open-ended schemes of long-term criminal conduct. With respect to the duration of this scheme, the period of advertising, selling, exporting, and receiving payment for the shipment of SMAW warheads that Defendants allegedly sold to Plaintiffs spans a period of at least one year from

-48-

April 1993, when Defendants allegedly began the scheme to rid themselves of the SMAW warheads at the Swannanoa facility and assign pending contracts from JRC to Accurate, until April 1994, when Accurate received Plaintiffs' payment for a shipment of these warheads. And, if one considers Defendants' alleged efforts to conceal this sale and obstruct the investigation of facts which came to light during Mr. Hudak's criminal prosecution, the closed-ended scheme involving the SMAW warheads transferred to Plaintiffs may extend over a period of ten years. The predicate acts alleged during this period were continuous because each of them allegedly was performed in furtherance of Defendants' scheme to defraud. See Corley, 142 F.3d at 1055-56.

Even if the analysis is limited to the transactions which resulted in the transfer of SMAW warheads to Plaintiffs, Plaintiffs were not the only victim of these transactions, and the injuries to each alleged victim are distinct.  For example, the *Complaint* alleges that Canadian customs officials suffered a distinct injury because customs regulations were subverted by the allegedly fraudulent documentation that Defendants prepared.  The *Complaint* also alleges that other parties to the defense contract for the SMAW weapons system (including the United States Government) suffered distinct injuries as a result of Defendants' alleged theft of the warhead components and failure to dispose of non-conforming warheads in accordance with government regulations and contracts.

If Plaintiffs' allegations regarding other illegal sales of SMAW warheads or similar devices are taken into account, the scheme of racketeering activity at issue here may become open-ended and extend to other persons or entities who purchased or otherwise came into

possession of SMAW warheads or similar devices that were once stockpiled at Defendants'

facilities.   Plaintiffs support these allegations by citing to testimony of witnesses at Mr.

Hudak's criminal trial to the effect that "illegal sales of SMAW warheads were made to others

besides Plaintiffs including other blasting companies and oil-industry businesses."  [Doc. 1,

¶ 113.]  Plaintiffs also aver that there were at least 6,000 SMAW warheads stockpiled at JRC

and HESI's Swannanoa facility, and after the sale of 2,601 warheads to Plaintiffs, there

remained at least 3,399 SMAW warheads unaccounted for.  [Doc. 1, ¶¶ 114, 115.]

        If true, such allegations could present a long-term threat of future criminal activity,

because they suggest that Defendants' alleged sale of SMAW warheads to Plaintiffs was part

of a larger scheme, or regular way of doing business, involving "innumerable predicate acts

of mail fraud [or other listed crimes] occurring over a significant period of time, . . . directed

against a significant number of victims, all of whom experienced [or are still at risk of

experiencing] distinct injuries" associated with their illegal purchase or possession of these

destructive devices.  Corley, 142 F.3d at 1050.  Moreover, Plaintiffs allege that Defendants

continue to act in furtherance of this scheme so long as they are purposefully obstructing

investigative efforts which are necessary to track down and recover the warheads which are

presently unaccounted for.  In these respects, the alleged scheme did not end when Plaintiffs

began to suspect something was amiss as a result of Mr. Hudak's criminal prosecution,

because "other victims presumably were still being harmed," and Defendants' subsequent

communications with Plaintiffs "could still be in furtherance of the scheme because . . . [they]

denied the existence of any fraudulent activity and served to deflect regulatory attention away

from defendants' operations." Id. at 1057.

I also consider the complexity and size of the alleged scheme, as well as the nature or

character of the enterprise or unlawful activity, to be significant factors here. See Stone, 998

F.2d at 1543-44.  My analysis of these factors may take into consideration some of the

background allegations in Plaintiffs' *Complaint* "that are not necessarily charged as predicate

acts."   Id. at 1544.  In particular, I take into account the number of Defendants and the

alleged changes in their corporate form and ownership of their assets that allegedly coincided

with a concerted effort to rid themselves of actual or potential liability associated with the

SMAW warheads and similar devices once stockpiled at the Swannanoa facility.  These

factors add to the complexity and size of the scheme.

I also take into account that the activity at issue here involves the transfer of highly

dangerous products which are heavily regulated by the United States and Canadian

governments and subject to export controls.  Due to their nature and character, the potential

harm caused by such transfers does not necessarily end when the products themselves have

been stolen or when the alleged victims have lost their money.  Rather, this potential harm

continues to exist so long as such products remain in circulation in unauthorized markets or

are left exposed to unauthorized uses, and the relevant authorities are unable to effectively

recall or retrieve the products because their chains of custody remain concealed.

Taking all of these factors into account, I conclude that the "'natural and

commonsense'" result of the allegations in Plaintiffs' *Complaint* is to state a "pattern of

-51-

racketeering activity" within the meaning of the RICO statute.  Stone, 998 F.2d at 1544 (quoting U.S. Textiles, Inc. v. Anheuser-Busch Cos., Inc., 911 F.2d 1261, 1267 (7th Cir. 1990)).  It follows that Plaintiffs' *Complaint* is not subject to dismissal for failure to sufficiently allege this essential element of their civil RICO claims.

### c.    Enterprise

Plaintiffs' civil RICO claims also depend on the existence of an "enterprise" that is distinct from the pattern of racketeering activity itself as well as each of the persons or entities named as Defendants with respect to those claims.  See United States v. Turkette, 452 U.S. 576, 583 (1981) ("The 'enterprise' is not the 'pattern of racketeering activity';  it is an entity separate and apart from the pattern of activity in which it engages."); Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001) ("[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities:  (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name.").

In addition to making these distinctions, Plaintiffs' *Complaint* must allege "the existence of 'an ongoing organization with a decision-making framework or mechanism for controlling the group,' and 'that various associates function as a continuing unit.'"  Smith, 413 F.3d at 1266-67 (quoting United States v. Sanders, 928 F.2d 940, 943-44 (10th Cir. 1991)).  This requirement follows from the RICO statute's definition of the term "enterprise," which includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C.  § 1961(4).

-52-

Courts generally group this statutory definition into two categories: "The first encompasses organizations such as corporations and partnerships, and other 'legal entities.' The second covers 'any union or group of individuals associated in fact although not a legal entity.'" Turkette, 452 U.S. at 581-82. Unlike the first category, the second category places "no restriction upon the associations embraced by the definition: an enterprise includes any union or group of individuals associated in fact." Id. at 580.

Further, the RICO statute's definition of "enterprise" may extend to both legitimate legal entities that are victimized by racketeering activity as well as other types of business associations that serves as vehicles for such activity. Thus, "RICO both protects a legitimate 'enterprise' from those who would use unlawful acts to victimize it, and also protects the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which 'unlawful ... activity is committed.'" King, 533 U.S. at 164 (quoting Scheidler, 510 U.S. 259) (citations omitted).

In this case, Plaintiffs' *Complaint* alleges several different alternative theories in order to satisfy the "enterprise" element of their civil RICO claims. Under the category of legal entities victimized by Defendants' racketeering activities, Plaintiffs allege that Hydro Cut itself, or the parties with whom Defendants contracted for the production of the SMAW weapons system (such as DOD, MDC, or USMC), may serve as a RICO enterprise that is distinct from each Defendant and the alleged pattern of racketeering activity. Under the broader category of associations-in-fact, Plaintiffs allege three additional, distinct RICO enterprises: (1) an association-in-fact comprised of the parties to the contracts involved in

-53-

producing the SMAW weapons system; (2) an association-in-fact comprised of the parties involved in the changes in corporate form and the transfer of assets and liabilities (including the stockpile of SMAW warheads at the Swannanoa facility) that took place when Accurate took over JRC's former Defense and Aerospace Division; and (3) an association in fact comprised of an ongoing supplier-purchaser or debtor-creditor relationship between Plaintiffs and Defendants which pre-existed the sale and export of the SMAW warheads.

It is reasonable to infer that a legal entity such as Hydro Cut, DOD, USMC, or MDC has a corporate or governmental structure which easily meets the requirements of "'an ongoing organization with a decision-making framework or mechanism for controlling the group,'" and with "'various associates function[ing] as a continuing unit.'" Smith, 413 F.3d at 1266-67 (quoting Sanders, 928 F.2d at 943-44). Courts have held that there is nothing in the definition of a RICO enterprise that precludes a governmental entity, such as DOD or USMC, from meeting this definition in appropriate circumstances. See United States v. Urban, 404 F.3d 754, 770 (3d Cir. 2005) (collecting cases in which governmental entities were found to be RICO enterprises); cf. Smith, 413 F.3d at 1266 (adopting the Third Circuit's framework for analyzing the enterprise element of a RICO claim).

Similarly, courts have held that RICO plainly contemplates situations in which the pattern of racketeering activity is to the detriment of the enterprise rather than in furtherance of it. See generally United States v. Irizarry, 341 F.3d 273, 304 (3d Cir. 2003) (citing United States v. Provenzano, 688 F.2d 194, 200 (3rd Cir. 1982)). Thus, there are instances in which an alleged victim of racketeering activity may serve as both the plaintiff in a civil RICO action

and the enterprise on which a civil RICO claim is premised.   See, e.g., Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1557-58 (1st Cir. 1994) (concluding that a civil RICO plaintiff met the definition of a RICO enterprise).  For these reasons, I conclude that Plaintiffs may allege one or more of the above legal entities (Hydro Cut, DOD, MDC, or USMC) as a distinct enterprise for purposes of their civil RICO claims.[9]

I next turn to the associations-in-fact alleged in Plaintiffs' *Complaint*.  More stringent requirements may apply to the task of proving that an association-in-fact is a RICO enterprise distinct from the pattern of racketeering activity in which the members of that association are engaged.  For example, courts are skeptical of RICO claims premised on associations-in-fact that consist of nothing more than closely-related components of the same corporate entity (such as parent companies and their subsidiaries, officers, or agents), because pleading such close associations may serve to circumvent the requirement that the enterprise is distinct from the persons participating in the pattern of racketeering activity.   See, e.g., Brannon v. Boatmen's First Nat'l Bank, 153 F.3d 1144, 1147 (10th Cir. 1998); Bd. of County Comm'rs v. Liberty Group, 965 F.2d 879, 885 (10th Cir. 1992).

These principles likely preclude Plaintiffs from using an association-in-fact comprised of only HESI and JRC to satisfy the enterprise requirement of their civil RICO claims pertaining to the "Halliburton/JRC Scheme," inasmuch as JRC is or was simply a division or

---

[9]It does not necessarily follow from this conclusion that Defendants participated in the operation or management of any of these legal entities.  The issue of participation is addressed separately in the next section of this *Memorandum Opinion and Order*.

subsidiary of HESI.  Similarly, Plaintiffs may not satisfy the enterprise element of their civil

RICO claims pertaining to the "JRC/Accurate Scheme" by alleging an association-in-fact

comprised of only Mr. Sonday and one of the Accurate companies for which he serves as an

officer, employee, or agent.

These principles do not, however, preclude Plaintiffs from satisfying the enterprise

requirement by means of an association in fact among HESI/JRC and the other parties to the

government contract for the production of the SMAW weapons system.  Courts have

acknowledged that " a defendant can clearly be a person under the statute and also be *part* of

the enterprise.  The prohibition against  the unity of person and enterprise applies only when

the singular person or entity is defined as both the person and the only entity comprising the

enterprise."  United States v. Goldin Indus., Inc., 219 F.3d 1271, 1275 (11th Cir. 2000)

(collecting cases).  Thus, a RICO enterprise may consist of an association-in-fact where each

member of that association "is a separate and distinct corporation" consisting of "a separate

ongoing business with a separate customer base,"  id. at 1277, provided "'that [the] various

associates function as a continuing unit.'"  Smith, 413 F.3d at 1266-67 (quoting Sanders, 928

F.2d at 943-44).

It is reasonable to infer from the allegations in the *Complaint* that an association of

governmental entities and private contractors involved in the production of the SMAW

weapons system (including DOD, USMC, MDC, HESI/JRC, and/or Accurate) functioned as

"'an ongoing organization with a decision-making framework or mechanism for controlling

the group,'" and with "'various associates function[ing] as a continuing unit.'"  Smith, 413

F.3d at 1266-67 (quoting Sanders, 928 F.2d at 943-44).  Further, this association-in-fact is distinct from the alleged pattern of racketeering activity, because its purposes extended to many other tasks related to the SMAW weapons system as a whole, rather than simply the illegal sale or disposal of the non-conforming warheads which allegedly ended up in Plaintiffs' possession.  In this regard, Plaintiffs' *Complaint* contains supporting averments which cite specific provisions of the government contract for the production of the SMAW weapons system and explain Defendants' respective roles in performing those contracts. [Doc. 1, at ¶¶ 3 through 8, 36 through 42, 52, 53, 68, 79, 80, 81, 95, 112, 113, 114.]

It is also reasonable to infer that HESI/JRC could form an association-in-fact with Accurate for purposes of satisfying the enterprise element of Plaintiffs' civil RICO claims regarding the "JRC/Accurate Scheme."  According to Plaintiffs' *Complaint*, Accurate is a corporation or group of corporations that is separate and distinct from HESI/JRC and that consisted of separate ongoing businesses which joined forces with HESI/JRC for the specific purposes of transferring the assets of JRC's Defense and Aerospace Division to Accurate and limiting the liabilities associated with this transfer.  The allegations in the *Complaint* support a reasonable inference that this association involved a series of express and implied contractual relationships that created a framework for controlling and coordinating all of these companies' decision-making on matters relevant to the assignment of pending contracts to Accurate and the shut down of operations at the Swannanoa facilities.  This association-in-fact is distinct from the pattern of racketeering activity involving the illegal sale of SMAW warheads because it also encompassed the larger task of transferring the assets and liabilities

of an entire division of JRC to Accurate, of which the SMAW warheads were only one component. Again, Plaintiffs' *Complaint* contains supporting averments citing specific contractual assignments and explaining how the sale of the SMAW warheads fit into a larger plan to shut down operations at the Swannanoa facility and transfer assets to Accurate. [Doc. 1, at ¶¶ 7, 8, 20, 23, 25 through 33, 41, 55, 56, 114.]

Plaintiffs also allege an association-in-fact consisting of their own supplier-purchaser or debtor-creditor relationship with Defendants. There is nothing inherent in the nature of a RICO enterprise that would necessarily preclude an association-in-fact comprised of both Plaintiffs and Defendants from constituting such an enterprise. See, e.g., Sedima, 473 U.S. at 483-84 (noting that plaintiff and defendant were part of same joint venture). But in this case, Plaintiffs must allege something more than just the association entailed by the contract for the sale of the SMAW warheads themselves, or else the pattern of racketeering activity is not distinct from the alleged enterprise.

Plaintiffs make this distinction by alleging that the sale of the SMAW warheads was only one of a series of ongoing purchases, and that this ongoing series of purchases involved larger contracts covering issues such as financing and transportation that were sufficient to create "'an ongoing organization with a decision-making framework or mechanism for controlling the group,'" and with "'various associates function[ing] as a continuing unit.'" Smith, 413 F.3d at 1266-67 (quoting Sanders, 928 F.2d at 943-44). As to the alleged association-in-fact between Hydro Cut and JRC/HESI, I find enough supporting averments in Plaintiffs' *Complaint* to support this enterprise theory. [Doc. 1, ¶¶ 18-22, 26-32, 51, 59.]

The *Complaint* is less specific, however, with respect to an ongoing supply chain with Accurate that persisted after that company purchased JRC/HESI in 1994.  Because Plaintiffs have alleged other alternative theories which meet the requirements for pleading the enterprise element of their civil RICO claims as to each Defendant, I conclude that it is unnecessary to decide, at this preliminary juncture, whether Plaintiffs' supplier-purchaser relationship with Accurate also is legally sufficient to meet these requirements.

In this regard, I note that the main focus of Defendants' objections to the legal entities and associations-in-fact alleged in Plaintiffs' *Complaint* is not that such entities or associations are precluded, as a matter of law, from combining to form RICO enterprises. Rather, the focus of Defendants' arguments is that they did not participate in the operation or management of such entities, or that their participation has no nexus to the pattern of racketeering activity Plaintiffs are alleging here.  I address these objections separately in the following section of this *Memorandum Opinion and Order*.

### d.    <u>Participation and Nexus</u>

The final elements of Plaintiffs' civil RICO claims under 18 U.S.C. § 1962(c) require them to affirmatively link Defendants to the alleged RICO enterprises and the pattern of racketeering activity by explaining how Defendants participated in the conduct of these alleged enterprises.  The Supreme Court discussed the "participation" element of a RICO claim in <u>Reves v. Ernst & Young</u>, 507 U.S. 170,  179 (1993).  At issue in <u>Reves</u> was whether an accounting firm that contracted with an enterprise was limited to the outside role of a reviewer and auditor of existing records prepared by the enterprise itself, or whether that

accounting firm went further and participated in the management of the enterprise by taking on the dual role of first creating financial records for the enterprise and then using those financial records as the basis for an outside audit. See id. at 194-96 (Souter, J., dissenting). The majority opinion rejected the latter view and, in so doing, adopted the "'operation or management' test" to determine whether the "participation" element of a claim under Section 1962(c) of the RICO statute is satisfied. Id. at 179, 186. (1993); see Stone, 998 F.2d at 1541; Bancoklahoma Mortgage Corp., 194 F.3d at 1100.

Under this test, "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management. An enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it as, for example, by bribery." Reves, 507 U.S. at 184 (footnote omitted). On the other hand, Section 1962(c) "is limited to persons 'employed by or associated with' an enterprise," and therefore this provision cannot be interpreted to reach outsiders who merely participate in "their own affairs" rather than the affairs of the enterprise. Id. at 185.

Because a claim under Section 1962(c) of RICO necessarily involves "participation in the operation or management of an enterprise *through* a pattern of racketeering activity," Reves, 507 U.S. at 184 (emphasis added), a RICO claim also entails a "nexus" between the pattern of racketeering activity and the Defendants' participation in the enterprise's conduct, see Smith, 413 F.3d at 1272; Irizarry, 341 F.3d at 301 (citing United States v. Jannotti, 729 F.2d 213, 226 (3d Cir. 1984));  United States v. Marino, 277 F.3d 11, 27-28 (1st Cir. 2002)

(collecting cases).  Such a nexus is not present where, for example, certain employees or associates of an enterprise privately engage in criminal activity that has nothing to do with the operation or management of the enterprise itself.  See United States v. Cauble, 706 F.2d 1322, 1332 (5th Cir. 1983) (citing United States v. Dennis, 458 F. Supp. 197, 199 (E.D. Mo. 1978)).

In the present case, I conclude that Plaintiffs' *Complaint* alleges the required nexus between a pattern of racketeering activity and Defendants' participation in the conduct of the following enterprises:  (1) the association-in-fact between JRC/HESI and Accurate, (2) the association-in-fact between JRC/HESI and Hydro Cut,  and (3) the enterprises relating to the government contracts for the SMAW weapons system, including DOD, USMC, MDC, or an association-in-fact involving these entities, JRC/HESI, and/or Accurate.  According to Plaintiffs, each of these enterprises provided "resources, property, or facilities" through which Defendants were able to accomplish their pattern of racketeering activity and without which all or part of this pattern would not have transpired.  Marino, 277 F.3d at 28.  Further, the *Complaint* alleges the Defendants' respective positions in these enterprises "facilitated their commission of the racketeering acts," and "the predicate acts had some effect on the lawful enterprise."  Cauble, 706 F.2d at 1333.

In particular, Plaintiffs allege that their agreement to purchase and export the SMAW warheads was built on the good will, reputation, and resources that resulted from the pre-existing supplier-purchaser relationship between JRC/HESI and Hydro Cut, JRC/HESI's status as a defense contractor, and the conferral of such good will, reputation, and resources on Accurate through that company's association with JRC/HESI.  Plaintiffs also allege that

Defendants would not have gained access to the SMAW warheads themselves but for their associations with the other parties to the contracts for the SMAW weapons system.  Finally, the predicate acts of racketeering are alleged to have affected the enterprises listed above, either beneficially (in the case of the JRC/HESI/Accurate association) or detrimentally (in the case of the SMAW weapons-system enterprises and the JRC/HESI/Hydro Cut association). For these reasons, I conclude that Plaintiffs' civil RICO claims cannot be dismissed based on the lack of a nexus between the alleged pattern of racketeering activity and Defendants' participation in the conduct of the RICO enterprises listed above.

This conclusion does not end the inquiry, for Plaintiffs' *Complaint* also must satisfy the "operation or management" test articulated in Reves, 507 U.S. at 179.  This test does not pose an obstacle to Plaintiffs' theory that Defendants participated in the operation or management of the associations in fact involving JRC/HESI/Accurate and JRC/HESI/Hydro Cut, because Defendants are alleged to be members of these associations and, therefore, are readily distinguishable from the accounting firm in Reves, which was a separate entity from the company alleged as the enterprise in that case.  See MCM Partners v. Andrews-Bartlett & Assocs., 62 F.3d 967, 979 (7th Cir. 1995).  Reves did not involve an allegation that the accounting firm was part of an association-in-fact enterprise.

The "operation or management" test also does not pose a significant obstacle to Plaintiffs' claims that Defendants participated in the conduct of the SMAW weapons-system enterprise involving DOD, USMC, MDC, or an association-in-fact between these entities, JRC/HESI, and/or Accurate.  Under the government contracts for the SMAW weapons

systems, Defendants were not merely the supplier of an off-the-shelf product to a one-time purchaser. Rather, Defendants allegedly were responsible for all aspects of producing the warhead component of the SMAW weapons system and complying with all contractual provisions related to that component of the system (including proper accounting and disposal of non-conforming warheads, and proper handling of classified specifications). Insofar as this key component of the overall enterprise was delegated to Defendants' control, it is reasonable to infer that Defendants participated in the operation or management of the SMAW weapons system enterprise, albeit on a "lower rung" than the alleged general contractor, MDC, or governmental entities such as DOD or USMC to which the components of this weapons system ultimately belonged. See Reves, 507 U.S. at 184. Reves makes it relatively clear that such lower-rung participants are not exempt from liability under Section 1962(c) of RICO, and thus the fact that one or more of the Defendants were subcontractors under some degree of supervision or control by a government entity such as DOD, or by a general contractor such as MDC, does not necessarily preclude a finding that they participated in the operation and management of this alleged enterprise.

I reach a different conclusion with respect to the allegation that Defendants participated in the operation or management of Hydro Cut as a distinct enterprise. Inasmuch as Plaintiffs' theories rely solely on Hydro Cut, as a legal entity, to satisfy the enterprise element of a RICO claim, the Defendants in the case at bar may be situated in a position analogous to the accounting firm in Reves, which the Supreme Court regarded as an outsider managing its own affairs.

The fact that Hydro Cut allegedly *relied* on the work of an outside firm in securing the necessary approvals to export the SMAW warheads does not necessarily mean that the outside firm *participated* in the management of Hydro Cut's affairs. <u>Reves</u> makes it relatively clear that reliance and participation are two different concepts. <u>See id.</u> And while <u>Reves</u> involved an accounting firm rather than a supplier of goods, other courts have concluded that the mere existence of such a supplier-purchaser relationship does not support a reasonable inference that the supplier is participating in the operation or management of the purchaser's enterprise. <u>See, e.g.</u>, <u>Arenson v. Whitehall Convalescent and Nursing Home, Inc.</u>, 880 F. Supp. 1202, 1209 (N.D. Ill. 1995) (involving a supplier-purchaser relationship between a pharmacy and a nursing home where the nursing home was named as a defendant and the pharmacy was named as the RICO enterprise).

My conclusion rejecting a claim based on the allegation that Defendants participated in the conduct of Hydro Cut as a separate enterprise is not dispositive, however, because Plaintiffs have alleged other RICO enterprises for which the nexus and "operation or management" requirements are satisfied with respect to each Defendant and each count. <u>Cf. id.</u> at 1209 n.10 (concluding that the plaintiffs alleged another viable enterprise theory notwithstanding the dismissal of their supplier-purchaser theory). And because Plaintiffs have alleged at least one viable theory which satisfies all the required elements of a civil RICO claim under 18 U.S.C. § 1962(c) as to each Defendant and each count, I conclude that Defendants' motions to dismiss these claims under Fed. R. Civ. P. 12(b)(6) or 12(c) must be denied at this juncture.

e.     **Conspiracy**

I next turn to Plaintiffs' conspiracy claims under Section 1962(d) of the RICO statute. Section 1962(d) "lacks an overt act requirement" that is found in some other conspiracy statutes. Smith, 413 F.3d at 1265. Thus, "a defendant can be convicted under § 1962(d) upon proof that the defendant knew about or agreed to facilitate the commission of acts sufficient to establish" the substantive offense of violating Section 1962(c), id., even if that defendant "does not agree to commit or facilitate each and every part of the substantive offense" and is "incapable of committing the substantive offense," Salinas v. United States, 522 U.S. 52, 63-64 (1997).

In other words, a defendant need not commit or agree to commit two or more of the predicate acts required to establish a "pattern of racketeering activity" under Section 1962(c) in order to be held liable for a violation of Section 1962(d).  For purposes of establishing a violation of Section 1962(d),

> it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.  He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion. One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense.  It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself.

Salinas, 522 U.S. at 477.

Following the Supreme Court's opinion in Salinas, the Tenth Circuit has adopted the following formulation of the elements that Plaintiffs' *Complaint* must allege in order to establish a viable claim for a violation of Section 1962(d) in this case:  "the defendant (1) by

knowing about and agreeing to facilitate the commission of two or more acts (2) constituting a pattern (3) of racketeering activity (4) participates in (5) an enterprise (6) the activities of which affect interstate or foreign commerce."  Smith, 413 F.3d at 1266.  The foregoing discussion of Plaintiffs' substantive claims under Section 1962(c) suffices to explain why elements (2) through (6) of their conspiracy claims under Section 1962(d) are satisfied at the pleading stage of this litigation.  See MCM Partners, 62 F.3d at 979 (applying analysis of Section 1962(c) claims to overlapping elements of Section 1962(d) claims).

The primary benefit to Plaintiffs of alleging a conspiracy under Section 1962(d) at this stage of the litigation is that it may allow them to hold Accurate liable for JRC/HESI's alleged violations of Section 1962(c) that rely on acts preceding the sale of JRC's Defense and Aerospace Division to Accurate in 1994; and conversely, the conspiracy charges may allow Plaintiffs to hold JRC/HESI liable for Accurate's alleged violations of 1962(c) that rely on acts occurring after the sale of the Defense and Aerospace Division.  The conspiracy charge may accomplish this objective by alleging that JRC/HESI and Accurate knew about and agreed to facilitate the commission of one another's predicate acts of racketeering.[10]

The Tenth Circuit has held that "[a] conspiratorial agreement . . . 'need not be express so long as its existence can plausibly be inferred from the defendant['s] words and actions and

_____

[10]Inasmuch as Accurate is a separate entity (or group of entities) from JRC and HESI, this conspiracy theory would survive application of the intracorporate conspiracy doctrine.  See generally David B. Smith & Terrance G. Reed, Civil RICO ¶ 7.02[7][a][ii], at 7-30.2 to 7-30.3 (2005) (noting a split among the federal circuits as to whether the intracorporate conspiracy doctrine applies to RICO conspiracy claims).

the interdependence of activities and persons involved." Smith, 413 F.3d at 1273 (quoting

United States v. Cianci, 378 F.3d 71, 90 (1st Cir. 2004)).  The Tenth Circuit also has observed

that "the nature of conspiracies often makes it impossible to provide details at the pleading

stage," and that granting a defendant's motions to dismiss "is a harsh remedy which must be

cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to

protect the interests of justice." Brever v. Rockwell Int'l Corp., 40 F.3d 1119, 1128 (10th Cir.

1994) (citations and internal quotation marks omitted).  In light of these authorities, I

conclude that Plaintiffs' *Complaint* meets the minimum requirements for pleading RICO

conspiracy claims against each Defendant that are premised on one or more of the violations

of Section 1962(c) of the RICO statute alleged elsewhere in the *Complaint*.

### C.      Personal Jurisdiction over Defendants Sonday, Accurate, and JRC

Defendants JRC, Accurate, and John Sonday have moved to dismiss Plaintiffs'

*Complaint* against them on the alternative grounds that this Court lacks personal jurisdiction

over them because they do not have the minimum contacts with the State of New Mexico that

are necessary to comport with the concept of due process.  Defendants also allege that there

is an alternative forum where they are all subject to suit, namely the Western District of North

Carolina.

The analysis of these motions may depend on whether the civil RICO claims asserted

in Plaintiffs' *Complaint* are subject to dismissal at this juncture, because without these claims

Plaintiffs' *Complaint* lacks a federal statute on which to expand the reach of this Court's

personal jurisdiction.  I have concluded that Plaintiffs' civil RICO claims are not subject to

dismissal at this juncture, and therefore Plaintiffs may avail themselves of the RICO statute's special provisions regarding personal jurisdiction, venue, and service of process.  See 18 U.S.C. § 1965.

The parties disagree as to the meaning of these special provisions in the RICO statute. Plaintiffs advocate an expansive reading of these provisions under which 18 U.S.C. § 1965(d) confers nationwide jurisdiction subject only to the constraints imposed by the Due Process Clause of the Fifth Amendment as articulated by the Tenth Circuit in Peay v. Bellsouth Med. Assistance Plan, 205 F.3d 1206 (10th Cir. 2000).  Defendants, on the other hand, advocate a narrower reading of the statute under which a civil RICO action may be heard in a particular district only when "the ends of justice" so require.  18 U.S.C. § 1965(b). According to Defendants, the "ends of justice" requirement is satisfied only when the requirements for personal jurisdiction under 18 U.S.C. § 1965(a) are satisfied as to at least one defendant, and there is no other alternative forum which would have jurisdiction over all of the Defendants. See Butcher's Union Local No. 498 v. SDC Inv., Inc., 788 F.2d 535, 539 (9th Cir. 1986).

I agree with Plaintiffs that the framework articulated by the Tenth Circuit in Peay, 205 F.3d at 1212-13, applies to Defendants' motions to dismiss the Complaint for lack of personal jurisdiction.  Under this framework, I conclude that the "ends of justice" requirement in Section 1965(b) is more appropriately treated as a limitation on venue rather than a limitation on personal jurisdiction.  See Bridge v. Invest Am., Inc., 748 F. Supp. 948, 951 (D.R.I. 1990) (collecting cases); cf. ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 627 (4th Cir.1997) (concluding that venue and personal jurisdiction require distinct analyses), Peay, 205 F.3d at

-68-

1213 n.6 (noting that inconvenience which does not rise to the level of a constitutional violation may nevertheless be accommodated through a change of venue).  I also reject Defendants' narrow reading of the "ends of justice" requirement and conclude that the availability of an alternative forum is but one factor to consider in determining whether this requirement is met.  See generally David B. Smith & Terrance G. Reed, Civil RICO ¶ 6.01[4], at 6-21 (2005) (collecting cases following this approach).

Accordingly, my analysis of Defendants' jurisdictional challenges follows the due-process framework set forth in Peay, and I defer further discussion of the "ends of justice" requirement until my analysis of Defendants' motions to dismiss or transfer based on improper venue.  To the extent that the "ends of justice" are properly considered in regard to Defendants' jurisdictional motions as well, I would apply that requirement to these motions in the same way I apply it to Defendants' venue challenges.

Under the Peay framework, I must first determine whether the RICO statute "'potentially confers jurisdiction' by authorizing service of process on the [D]efendant[s]." Id. at 1209 (quoting Republic of Panama, 119 F.3d at 942).  If the answer to this question is yes, then I next examine "'whether the exercise of [such] jurisdiction comports with due process'" under the Fifth Amendment to the United States Constitution.  Id. (quoting Republic of Panama, 119 F.3d at 1209).

The question before the Tenth Circuit in Peay was  whether the Employee Retirement Income Security Act of 1974 (ERISA) potentially confers jurisdiction by authorizing nationwide service of process.  See id.  The Tenth Circuit's analysis of that issue followed

the reasoning that the Eleventh Circuit previously applied to the RICO statute in Republic of Panama, 119 F.3d at 1209.  Under that reasoning, "Section 1965(d) of the RICO statute provides for service in any judicial district in which the defendant is found," and "[w]hen a federal statute provides for nationwide service of process, it becomes the statutory basis for personal jurisdiction."  Id.

Other courts also have drawn parallels between the provisions of ERISA and RICO with regard to service of process.  See, e.g., Cent. States, Se. and Sw. Areas Pension Fund v. Reimer Express World Corp., 230 F.3d 934, 941 (7th Cir. 2000).  And while some courts find the statutory basis for personal jurisdiction over a RICO defendant in Section 1965(b) of the RICO statute instead of Section 1965(d), see, e.g., PT United Can Co. Ltd. v. Crown Cork & Seal Co., 138 F.3d 65, 71-72 (2d Cir. 1998), the majority view is that at least one of these two provisions can provide grounds for establishing personal jurisdiction in any district within the United States, see David B. Smith & Terrance G. Reed, Civil RICO ¶ 6.02[2][a], at 6-34 to 6-36 (2005).

In light of these authorities, I conclude that Plaintiffs have made a *prima facie* case that, by virtue of their civil RICO claims, there is a statutory basis for this Court to exercise personal jurisdiction over each of the Defendants.  This conclusion does not end the inquiry, however, because a court must still consider whether such an exercise comports with the

concept of due process embodied in the Fifth Amendment to the United States Constitution.[11]
See Peay, 205 F.3d at 1212.

"[I]n a federal question case where jurisdiction is invoked based on nationwide service of process, the Fifth Amendment requires the plaintiff's choice of forum to be fair and reasonable to the defendant," and thereby "'protects individual litigants against the burdens of litigation in an unduly inconvenient forum.'" Peay, 205 F.3d at 1212 (quoting Republic of Panama, 119 F.3d at 945).  But the Tenth Circuit has emphasized that "'it is only in highly unusual cases that inconvenience will rise to a level of constitutional concern.'" Id. at 1212-13 (quoting Republic of Panama, 119 F.3d at 947), and thus "[t]he burden is on the defendant to show that the exercise of jurisdiction in the chosen forum will 'make litigation so gravely difficult and inconvenient that [he] unfairly is at a severe disadvantage in comparison to his opponent.'" Id. at 1212 (quoting Burger King Corp., 471 U.S. at 478).

> [I]n evaluating whether the defendant has met his burden of establishing constitutionally significant inconvenience, courts should consider the following factors:  (1) the extent of the defendant's contacts with the place where the action was filed;  (2) the inconvenience to the defendant of having to defend in a jurisdiction other than that of his residence or place of business, including (a) the nature and extent  and interstate character of the defendant's business, (b) the defendant's access to counsel, and (c) the distance from the defendant to the place where the action was brought;  (3) judicial economy;  (4) the probable situs of the discovery proceedings and the extent to which the discovery proceedings will take place outside the state of the defendant's residence or place of business;  and (5) the nature of the regulated activity in question and

---

[11]To the extent that I must also consider whether "the ends of justice" warrant the exercise of personal jurisdiction pursuant to Section 1965(b) of the RICO statute, I construe the requirements of Section 1965(b) in a manner that parallels and reaches the same result as the constitutional due-process inquiry articulated in Peay and Republic of Panama.

the extent of impact that the defendant's activities have beyond the borders of his state of residence or business.

Id. (citations and internal quotation marks omitted).

"If a defendant successfully demonstrates that litigation in the plaintiff's chosen forum is unduly inconvenient, then 'jurisdiction will comport with due process only if the federal interest in litigating the dispute in the chosen forum outweighs the burden imposed on the defendant.'" Id. at 1213 (quoting Republic of Panama, 119 F.3d at 948).  To determine the weight of this federal interest,

> courts should examine the federal policies advanced by the statute, the relationship between nationwide service of process and the advancement of these policies, the connection between the exercise of jurisdiction in the chosen forum and the plaintiff's vindication of his federal right, and concerns of judicial efficiency and economy.  Where ... Congress has provided for nationwide service of process, courts should presume that nationwide personal jurisdiction is necessary to further congressional objectives.

Republic of Panama, 119 F.3d at 948.

In this case, I find that HESI has the requisite minimum contacts with the State of New Mexico to warrant this Court's exercise of personal jurisdiction pursuant to 18 U.S.C. § 1965(a), which "grants personal jurisdiction over an initial defendant in a civil RICO case to the district court for the district in which that person resides, has an agent, or transacts his or her affairs."  PT United Can Co., 138 F.3d at 71.  While HESI allegedly has its principal place of business in Texas, the company has not disputed Plaintiffs' allegations that it has an agent in New Mexico and transacts affairs in this state.

Insofar as JRC is sued as a division of HESI rather than a separate entity, this Court's personal jurisdiction extends to JRC as well.  JRC and HESI concede as much in their briefs. [Doc. 27.]  <u>See</u> <u>Plains Elec. Generation & Transmission Corp. v. N.M. Pub. Utilities Comm'n</u>, 1998-NMSC-038, ¶ 22, 126 N.M. 152, 926 P.2d 827 (1998) ("A separate, unincorporated, operating 'division' of a corporation, as opposed to an incorporated subsidiary, is not entitled to separate legal treatment."); <u>Northern Natural Gas Co. v. Vanderburg</u>, 785 S.W.2d 415, 421 (Tex. App. 1990) (similar); <u>Copperweld Corp. v. Independence Tube Corp.</u>, 467 U.S. 752, 770 (1984) (similar).

Additional analysis is required, however, to determine whether this Court's jurisdiction also extends to "Jet Research Center, Inc." as a former subsidiary of HESI.  To support the contention that it lacks sufficient minimum contacts with New Mexico to support this Court's exercise of personal jurisdiction, counsel for HESI/JRC has submitted a certificate of withdrawal filed with New Mexico's State Corporation Commission by "Jet Research Center, Inc., a Texas Corporation" on May 20, 1987. [Ex. 1 to Doc. 39.]  Counsel also has submitted a tax officer's declaration indicating that "Jet Research Center, Inc." did not have any operating activity in New Mexico or elsewhere since 1995, and that the company was only registered to do business in New Mexico from December 2, 1983, until May 20, 1987.  [Ex. 2 to Doc. 39.]

Defendants Accurate and Sonday contend that they also lack sufficient minimum contacts with the State of New Mexico and that Accurate is misnamed in Plaintiffs' *Complaint*.  In support of this contention, Mr. Sonday has submitted an affidavit in which he

-73-

states, among other things, that he is a resident of Tennessee and has never maintained any contacts with the State of New Mexico.  Mr. Sonday's affidavit also states that "Accurate Arms Company" has never advertised or registered to do business in New Mexico, and its products only reached this state through wholesalers engaged in nationwide product distribution.  According to Mr. Sonday, "Accurate Arms Company" was incorporated in Tennessee in 1980 but its assets were divided among "Western Powders, Inc." and "AAC Investments, Inc." in September 2004.  He further asserts that "Accurate Arms Company" is distinct from, and has never done business as "Accurate Energetic Systems, LLC."  [Doc. 60.]

In response to Mr. Sonday's affidavit, Mr. Hudak has provided an affidavit of his own, in which he disputes the contention that "Accurate Arms Company" and "Accurate Energetic Systems, LLC" are separate and distinct companies.  According to Mr. Hudak's affidavit, the two companies operated out of the same facilities and acted as if they were one and the same company during his business dealings with them.  Mr. Hudak further states that while he was operating a business known as "HEAT" in New Mexico from 1998 to 2002, he purchased supplies from, and had contracts with, these Accurate companies.  Thus, according to Mr. Hudak, the Accurate companies and their employees must have known that they were engaged in ongoing sales of products directly to a New Mexico business.  [Ex. A to Doc. 70.]

Plaintiffs also have supplied other affidavits and additional materials which dispute Mr. Sonday's assertions that Accurate Arms Company is separate from Accurate Energetic

-74-

Systems LLC and lacks any business contacts with New Mexico.[12]  [Ex. B, C, D to Doc. 70.]

These affidavits indicate that at least three gun retailers in Albuquerque, New Mexico, carry

Accurate Arms Company products and have done so for a number of years.  [Ex. C to Doc.

70.]  Plaintiffs also have submitted an affidavit pursuant to Fed. R. Civ. P. 56(f) requesting

additional discovery before the Court rules on the issue.  [Ex. E to Doc. 70.]

After reviewing the parties' submissions, I find that this Court's exercise of personal

jurisdiction over each of the Defendants, including Accurate, John Sonday, and JRC (as a

subsidiary of HESI), comports with the requirements of due process under the framework

articulated by the Tenth Circuit in Peay.  In the alternative, I find that questions pertaining to

whether Plaintiffs have named the proper corporate entity, and to what extent that entity has

contacts with New Mexico, are intertwined with the merits of the case and cannot be

conclusively resolved at this preliminary juncture without further discovery.  At a minimum,

Plaintiffs should be afforded the opportunity to conduct discovery in order to determine

whether "Jet Research Center, Inc." is simply an alter ego of HESI, and whether "Accurate

Arms Company" is simply an alter ego of, or different name for, one or more of the other

Accurate companies named in Mr. Sonday's affidavit that have done business in New

Mexico.  Cf. Frank v. U. S. West, Inc., 3 F.3d 1357, 1362 n.2 (10th Cir. 1993) (reciting

---

[12]Plaintiffs also submit a letter from Mr. Sonday's counsel indicating that Mr. Sonday would have invoked his Fifth Amendment privilege if called to testify in Mr. Hudak's criminal trial in New Mexico.  As indicated earlier in my analysis of the predicate act of obstruction of justice, I will not consider any parties' invocation of a Fifth Amendment privilege as a basis for denying Defendants' motions, whether for jurisdictional purposes or on the merits.

various tests for determining whether a subsidiary is an alter ego of its parent corporation);

Northern Nat. Gas Co., 785 S.W.2d at 421 ("As a matter of law a corporate name change does

not affect its identity, property rights, or liabilities").

Moreover, I do not construe the framework articulated in Peay as limiting the Court's

analysis to the narrow question whether "Jet Research Center, Inc." or "Accurate Arms

Company, Inc." have significant contacts with the State of New Mexico at the time the

Complaint was filed or thereafter. Cf. Met Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d

560, 573 (2d Cir. 1996) (concluding that a district court erred in "mechanically limiting its

jurisdictional inquiry to the year 1993" when the jurisdictional challenge was raised). If the

"minimum contacts" test were construed so narrowly, then perhaps neither company would

be subject to the personal jurisdiction of any district court because "Jet Research Center, Inc."

allegedly ceased operations in 1995 and the assets of "Accurate Arms Company, Inc."

allegedly were divided among two other entities at some point in the past. And if at least one

of these companies were not subject to personal jurisdiction in another district, then RICO's

"ends of justice" provision would warrant this Court's exercise of personal jurisdiction even

under the restrictive application of that provision which Defendants advocate. See Multi-

Media Int'l, LLC v. Promag Retail Servs., LLC, 343 F. Supp. 2d 1024, 1030 (D. Kan. 2004)

(concluding that the "'ends of justice' require a plaintiff to bring all the defendants before"

a particular court when "no other district court possesses personal jurisdiction over all the

defendants"); Wells v. Dinkins, No. CIV 00-924 BB/DJS, at *5 (D.N.M. Nov. 22, 2000)

(similar), aff'd 37 Fed. Appx. 493 (10th Cir. June 14, 2002) (unpublished disposition).

I have no quarrel with the result that the district courts reached in <u>Wells</u> or <u>Multi-Media Int'l</u> so long as it is confined to the particular facts of those cases.  <u>Multi-Media Int'l</u> expressly cites the Tenth Circuit's holding in <u>Peay</u>, and, in my view, simply stands for the proposition that Section 1965 of the RICO statute does not obviate the need for some form of constitutional due-process inquiry in this context.  And <u>Wells</u> appears to be a case where the plaintiffs' RICO claims arose entirely from the activities of defendants in the State of Washington, and the plaintiffs were seeking to avoid litigating their claims in a Washington court solely to escape the consequences of earlier adverse rulings by the courts of that state. In such circumstances, the availability of an alternative forum where all defendants are present may weigh so heavily that it becomes a dispositive factor under both the due-process framework articulated in <u>Peay</u> and the "ends of justice" inquiry mentioned in <u>Multi-Media Int'l</u>.

But the facts of the present case are distinguishable from <u>Wells</u> and <u>Multi-Media Int'l</u> to such an extent that those cases are inapposite with respect to the issue of personal jurisdiction.  Under the framework articulated by the Tenth Circuit in <u>Peay</u>, the extent of Defendants' contacts with the State of New Mexico, as well as the availability or convenience of other fora, are only two of the factors that a court is to consider in the due-process inquiry. In this case, I conclude that these factors do not carry the same weight as they did in <u>Wells</u> or <u>Multi-Media Int'l</u>, and there are other factors which weigh more heavily in favor of this Court's exercise of jurisdiction.

In particular, the Court must consider "the nature and extent and interstate character of the defendant's business," as well as "the nature of the regulated activity in question and the extent of impact that the defendant's activities have beyond the borders of his state of residence or business." Peay, 205 F.3d at 1212.  For purposes of their jurisdictional motions, none of the Defendants present evidence which calls into question Plaintiffs' allegations that each of them are, or were at one time, engaged in highly regulated arms and explosives businesses with a significant interstate character and impact.[13]  For purposes of this jurisdictional inquiry, I also credit Mr. Hudak's assertions that while operating business or property in New Mexico he engaged in several transactions with Mr. Sonday and the Accurate companies (in one form or another).  "Jet Research Center, Inc." also appears to have engaged in a significant degree of interstate business, including contacts with New Mexico, before it ceased doing business altogether in 1995.  Thus, the nature, extent, and impact of these Defendants' business activities are readily distinguishable from cases such as Wells, No. Civ. 00-924 BB/DJS, or Diaz, No. Civ. 00-801 MCA/RLP, supra, which essentially involved personal disputes with individual defendants that occurred in a single state.

The claims presented in Plaintiffs' *Complaint* also are distinguishable from two-state fact patterns in which the plaintiff resides in one state and all the defendants reside in another. What is alleged here is not just a simple shipment of goods from a point of origin in North

---

[13]To the extent that Defendants dispute these allegations for purposes of their jurisdictional challenge, I find this dispute is intertwined with the merits and must await further discovery before this Court may fairly resolve it.

Carolina to an ultimate destination in New Mexico, but rather a complex series of transactions among North Carolina, Tennessee, Texas, Canada, New Mexico, and potentially other states or countries where the Defendants shipped SMAW warheads, negotiated contracts, or kept records regarding such shipments.

In these circumstances, the Court's task in ruling on a motion to dismiss for lack of personal jurisdiction is not simply to choose between the state of origin and the destination state, but rather to select which of several states may serve as a "jurisdictional hub" linking together the probable sites where discovery may occur or where a particular party or witness may reside.  The Court is faced with a situation in which Plaintiffs, who presently reside in Canada, allege that they suffered injuries while operating business and property in New Mexico, and that such injuries were caused by two Texas Defendants (HESI and JRC) and two Tennessee Defendants (Accurate and Mr. Sonday), all of which may have been involved with business and property at the Swannanoa site in North Carolina more than ten years ago.

Defendants have not shown that it would be appropriate for a Texas or Tennessee court to exercise personal jurisdiction over each of them in this multi-state scenario.  Thus, the only two potential fora identified by the parties are the District of New Mexico and the Western District of North Carolina.

It is by no means obvious that activities or witnesses in the Western District of North Carolina will be the central focus of this litigation.  Defendants have identified only one potential witness (Joseph Moore) who resided in the State of North Carolina at the time of their motion, and none of the parties currently have their principal places of business in that

district.  The location of the United States District Court for the Western District of North Carolina is approximately three hundred miles from the principal place of business of the closest Defendants (Accurate and Mr. Sonday), and is not significantly closer to the principal place of business of the Texas Defendants (JRC and HESI) than the District of New Mexico.

While the District of New Mexico is further away from Accurate, Mr. Sonday, and the four potential witnesses identified in Defendants' motions, Plaintiffs point to a substantial number of witnesses who reside in New Mexico, as well as a large amount of evidence located in New Mexico as a result of the criminal proceedings against Mr. Hudak that occurred in this district.  In contrast to Defendants' somewhat tenuous showing as to the few sources of discoverable evidence remaining in North Carolina, the substantial amount of evidence and witnesses unearthed in the District of New Mexico as a result of the criminal proceedings against Mr. Hudak is very likely to serve as a common and central focal point of the parties' substantive claims and defenses that does not diminish as the litigation proceeds. For example, Plaintiffs will likely point to the record of the criminal proceedings against Mr. Hudak to support their claims for damages as to each Defendant as well as their claims that Defendants' representations about the SMAW warheads were false.  In response, each Defendant will likely point to the other criminal charges against Mr. Hudak to support the argument that their respective actions were not the proximate cause of Plaintiffs' injuries.

Under these circumstances, I find that the District of New Mexico provides an appropriate "jurisdictional hub" for litigating Plaintiffs' claims.  The interests of judicial economy weigh in favor of litigating Plaintiffs' claims in the District of New Mexico

inasmuch as each parties' New Mexico counsel, as well as this Court, already have had some opportunity to become familiar with the underlying basis for this controversy during the course of discovery and trial in the criminal proceedings in this district.  And while it is probable that counsel for each of the parties (including Plaintiffs) will have to travel significant distances outside of their home states during the course of discovery, the "burdens of litigating in a distant forum have lessened" with the advent of the Internet, electronic case filing, video conferencing, and other technologies which make it possible to conduct many aspects of litigation without a physical presence in a particular district.  Peay, 205 F.3d at 1213.

In this regard, I note that most of the record of the criminal proceedings against Mr. Hudak, as well as the record in this civil action, is available electronically to counsel who have Internet access and an account with this Court.  Where each party can avail itself of the benefits of the technologies cited above, and is subjected to similar burdens of out-of-state travel, I cannot conclude that JRC, Accurate, and/or Mr. Sonday (individually or collectively) are "'at a severe disadvantage in comparison to [their] opponent.'"  Peay, 205 F.3d at 1212 (quoting Burger King Corp., 471 U.S. at 478).

In particular, there is no indication in the record that any of the Defendants lack the resources to hire out-of-state counsel to represent them in the District of New Mexico, and all Defendants are so represented at this time.  See Peay, 205 F.3d at 1212.  I note that counsel for HESI and JRC (as a division of HESI) also represents the former subsidiary, "Jet Research Center, Inc.," and counsel for "Accurate Arms Company" also represents Mr.

Sonday. These Defendants have made no showing that their respective interests and resources diverge in a way that would adversely impact their access to out-of-state counsel.

For these reasons, I find that the burden each Defendant must undertake in order to litigate in this district does not rise "to the level of constitutional concern." Peay, 205 F.3d at 1213. Even if one or more Defendants had successfully demonstrated that litigating this case in the District of New Mexico is "unduly inconvenient" for them, I also find that "'the federal interest in litigating the dispute in the [Plaintiffs'] chosen forum outweighs the burden imposed on the [D]efendant[s],'" Peay, 205 F.3d at 1213 (quoting Republic of Panama, 119 F.3d at 948).

In my view, the authorities cited above leave the district courts with discretion to weigh the applicable federal interests in light of the particular facts and circumstances of the case before them. Thus, there may be simpler fact patterns involving only one or two states where a court is justified in dismissing a civil RICO complaint without prejudice because it is obvious that there is an alternative forum which has jurisdiction over each defendant and provides a much more logical locus for the litigation. See, e.g., Wells, No. 00-924 BB/DJS, supra. But there are other scenarios where the federal policies underlying the RICO statute would be thwarted rather than advanced if courts were to reject a plaintiff's chosen forum. In particular, the search for an alternative forum as a panacea for jurisdictional disputes becomes less meaningful in a multi-state controversy such as this one where the alleged racketeering activity involves a complex and prolonged scheme that is not confined to just one or two states and that involves parties and witnesses who change corporate form or

employment status and move from one state to another. In such instances, the question of determining which forum or fora has jurisdiction over which defendants may yield no easy answer and can become intertwined with the merits of the case.

Under these circumstances, I find that the federal policies advanced by the RICO statute are served by the exercise of jurisdiction in Plaintiffs' chosen forum. See Peay, 205 F.3d at 1213. RICO's civil enforcement scheme relies on the standing of victims who are directly injured by a pattern of interstate racketeering activity to serve as "private attorneys general" in order to vindicate the federal rights protected by the statute. Rotella, 528 U.S. at 557. Plaintiffs have alleged such injuries here, and it is reasonable to infer that these injuries, combined with their residence in Canada, leave them with fewer resources to expend on pursuing litigation in a foreign district such as North Carolina where they currently have little or no significant contacts.[14] In such instances, the practical effect of requiring racketeering victims to litigate in such a forum is to place them at such a severe disadvantage in comparison to their opponents that the litigation is unlikely to proceed, and the congressional goal of enlisting private attorneys general to enforce the statute is thwarted. For all of the above reasons, I deny the motions of Defendants Accurate, John Sonday, and JRC (as a former subsidiary of HESI) to dismiss Plaintiffs' *Complaint* for lack of personal jurisdiction.

---

[14]To the extent that Defendants dispute whether Plaintiffs have suffered such injuries, I find that this jurisdictional dispute is intertwined with the merits of the Plaintiffs' claims and warrants further discovery before it may be fairly resolved.

Finally, I note that in adopting HESI's motion to dismiss, JRC has raised an issue of insufficiency of process or service of process.  [Doc. 39, at 6.]  In their response, Plaintiffs represent that JRC has agreed to withdraw this issue from consideration.  [Doc. 51, at 2.]  To the extent that JRC persists in contesting the sufficiency of process or service of process, Plaintiffs may request leave to attempt service on JRC a second time.  This issue does not provide grounds for dismissal of Plaintiffs' *Complaint*, because quashing insufficient service and granting leave to attempt service a second time is generally the preferred course of action where there is a reasonable prospect that such a second attempt will resolve the matter.  See Pell v. Azar Nut Co., 711 F.2d 949, 950 n.2 (10th Cir. 1983); Umbenhauer v. Woog, 969 F.2d 25, 30-31 (3d Cir. 1992).

### D.    Venue in the District of New Mexico

Defendants also challenge whether the District of New Mexico is the proper venue for this action.  Under Fed. R. Civ. P. 12(b)(3) and 28 U.S.C. § 1406(a), they move to dismiss or transfer Plaintiffs' *Complaint* for improper venue based on the specific provisions of the RICO statute, 18 U.S.C. § 1965, and the more general provisions of 28 U.S.C. § 1391. Defendants also move to transfer venue to the Western District of North Carolina under the discretionary standard articulated in 28 U.S.C. § 1404(a).

### 1.    Venue Under Fed. R. Civ. P. 12(b)(3) and 28 U.S.C. § 1406(a)

I first address Defendants' motions to dismiss or transfer for improper venue under Fed. R. Civ. P. 12(b)(3) and 28 U.S.C. § 1406(a).  As noted above, the federal RICO statute contains special provisions regarding personal jurisdiction, venue, and service of process.  See

18 U.S.C. § 1965.  Under these provisions, "[a]ny civil [RICO] action or proceeding ...

against any person  may be instituted in the district court of the United States for any district

in which such person resides, is found, has an agent, or transacts his affairs."  18 U.S.C. §

1965(a).  HESI meets the requirements of these provisions, and thus there is at least one

Defendant for which the District of New Mexico provides a proper venue under this statute.

Cf.  PT United Can Co., 138 F.3d at 71 (applying Section 1965(a) to an issue of personal

jurisdiction).

        Where at least one Defendant is subject to venue in the District of New Mexico under

the provisions of 18 U.S.C. § 1965(a), other Defendants also may be subject to venue in this

district under 18 U.S.C. § 1965(b) if "the ends of justice require."  Cf. PT Can Co., 138 F.3d

at 71 (discussing the relation between Sections 1965(a) and (b)).  Courts disagree, however,

as to what the phrase "ends of justice" means in this context.

        Defendants advocate the view that the "ends of justice" requirement is satisfied only

when there is no other venue in which all Defendants are subject to suit.  Cf. Multi-Media

Int'l, 343 F. Supp. 2d at 1030-31 (interpreting 18 U.S.C. § 1965(b) as a jurisdictional

requirement).  In other words, Defendants read the "ends of justice" requirement in a manner

that parallels the general venue statute under which venue may lie in "a judicial district in

which any defendant is subject to personal jurisdiction at the time the action is commenced,

if there is no district in which the action may otherwise be brought."  28 U.S.C. § 1391(b).

        Other courts have construed the phrase "ends of justice" more liberally and concluded

that this phrase allows for the exercise of discretion based on the facts and circumstances of

a particular case.  See, e.g., Am. Trade Partners, L.P. v. A-1 Int'l Importing Enters., Ltd., 755 F. Supp. 1292, 1304-05 (E.D. Pa. 1992); Miller Brewing Co. v. Landau, 616 F. Supp. 1285, 1290-91 (E.D. Wis. 1985); Kaplan v. Reed, 28 F. Supp. 2d 1191, 1204 (D. Colo. 1998); Monarch Normandy Square Partners v. Normandy Square Assoc. Ltd Partnership, 817 F.Supp. 899, 905 (D.Kan.1993).  I find these authorities to be more persuasive, and I reject Defendants' narrow view of Section 1965(b) because it "elevates what certainly should be a factor in the ends of justice determination into the sole factor." Am. Trade Partners, L.P., 755 F. Supp. at 1305 n.20.

Congress has directed that the RICO statute "shall be liberally construed to effectuate its remedial purposes." 18 U.S.C. § 1961 note; see Sedima, 473 U.S. at 497-98.  "Nowhere in section 1965(b) does it say that there must not be some other appropriate forum." Am. Trade Partners, L.P., 755 F. Supp. at 1305 n.20.  To read such a requirement into the statute might render Section 1965(b) superfluous, because then the "ends of justice" provision would simply duplicate the language already contained in 28 U.S.C. § 1391(b), under which venue may lie in "a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought."

I also conclude, however, that Section 1965(b) "should be invoked only after other possible statutory grounds for venue have been exhausted."  David B. Smith & Terrance G. Reed, Civil RICO, supra, ¶ 6.01[4], at 6-19; cf. Miller Brewing Co., 616 F. Supp. at 1291 ("The venue provisions of § 1965 are not exclusive;  rather, they are supplemental to those

found in §28 U.S.C. 1391.").  Therefore, I first consider other possible statutory grounds for venue before turning to the "ends of justice" inquiry.

In addition to the language quoted above, the general venue provisions of 28 U.S.C. § 1391 state that a civil action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated."  28 U.S.C. § 1391(b).  Unlike the narrow reading of 18 U.S.C. § 1965(b) favored by Defendants, this portion of 28 U.S.C. § 1391(b) "does not require the court to determine where [a] Defendant's activities were the most substantial." Multi-Media Int'l, 343 F. Supp. 2d at 1033.  So long as the forum activities played a substantial role in the circumstances leading up to Plaintiffs' RICO claims, it makes no difference whether another forum's contacts are more substantial, or the most substantial.  See id.

Thus, for example, if underlying litigation in one district forms a substantial part of the events or omissions giving rise to a plaintiff's claim, but the negotiation of a contract in another district also provides a substantial part of such events or omissions, then either the district where the underlying litigation occurred or the district where the contract negotiation took place may serve as a proper venue.  See Gulf Ins. Co., 417 F.3d at 355.  Although the plaintiff in Gulf Ins. Co. selected the forum where the contract was negotiated rather than the forum where the underlying litigation took place, the reasoning of that case supports Plaintiffs' selection of the District of New Mexico in the case at bar.

A substantial part of the events or omissions giving rise to Plaintiffs' civil RICO claims occurred in the District of New Mexico because the original injury stemming from the seizure of the SMAW warheads, as well as the criminal proceedings on which Plaintiffs' claims are grounded, all happened here.  See id.  Plaintiffs are likely to rely on New Mexico witnesses and evidence gathered in the criminal proceedings in this state to prove their damages and to prove that Defendants' representations regarding the legality of the sale and export of the SMAW warheads were false.  Defendants are likely to rely on the record developed in these New Mexico criminal proceedings to support the argument that their activities were not the proximate cause of Plaintiffs' injuries.  Although there are earlier transactions between Plaintiffs and Defendants that occurred in other fora, much of the evidence regarding these earlier transactions is already part of the record of Mr. Hudak's criminal case that is housed in the District of New Mexico and available to counsel here.

For these reasons, I conclude that venue properly lies in this district under 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b).  In the alternative, I also conclude that venue properly lies in this district under 18 U.S.C. §§ 1965(a) and 1965(b) because the "ends of justice" so require.

In support of this alternative finding, I incorporate my previous discussion of the issue of personal jurisdiction.  While I agree that there are instances in which the obvious availability of an alternative forum may preclude a finding that the "ends of justice" require the litigation to proceed in the state a plaintiff has selected, see, e.g., Wells, No. Civ. 00-924 BB/DJS, supra, I also construe this requirement as leaving room for district courts to exercise

their discretion based on the facts and circumstances of a particular case, see, e.g., Am. Trade Partners, L.P., 755 F. Supp. at 1304-05.  In a complex, multi-state controversy such as this one where Defendants are alleged to be co-conspirators, it is logical to select a forum that is likely to remain central to the litigation throughout its foreseeable scope and duration, regardless of whether a particular party or claim is added or dismissed at a particular juncture, and regardless of whether particular parties or witnesses move from one state to another or change their corporate form during the course of the controversy.  I conclude that Plaintiffs' chosen forum meets this criterion and that the alternative forum proposed by Defendants does not.  Accordingly, Defendants' motions to dismiss for improper venue under Fed. R. Civ. P. 12(b)(3) are denied.

### 2.      Venue under 28 U.S.C. § 1404(a)

Even where the law does not require a court to dismiss or transfer an action for improper venue under Fed. R. Civ. P. 12(b)(3) and 28 U.S.C. § 1406(a), the court may still transfer the action to another district under 28 U.S.C. § 1404(a) "for the convenience of parties and witnesses" and "in the interest of justice."   The latter statute gives district courts the discretion to transfer cases based on individualized considerations of convenience and fairness.  Stewart Org., Inc., 487 U.S. at 29 (citing Van Dusen, 376 U.S. at 622).  Unless these considerations weigh strongly in favor of the party moving for a transfer, however, the plaintiff's choice of forum should not be disturbed.  See Scheidt, 956 F.2d at 965.  28 U.S.C. § 1404(a) also "does not allow a court to transfer a suit to a district which lacks personal

jurisdiction over the defendants, even if they consent to suit there." Chrysler Credit Corp. v. Country Chrysler, Inc., 928 F.2d 1509, 1516 (10th Cir. 1991).

In determining how to weigh considerations of convenience and fairness in a given case, a court's exercise of discretion is guided by a number of case-specific factors.

> Among the factors [a district court] should consider is the plaintiff's choice of forum; the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; the cost of making the necessary proof; questions as to the enforceability of a judgment if one is obtained; relative advantages and obstacles to a fair trial; difficulties that may arise from congested dockets; the possibility of the existence of questions arising in the area of conflict of laws; the advantage of having a local court determine questions of local law; and, all other considerations of a practical nature that make a trial easy, expeditious and economical.

Texas Gulf Sulphur Co. v. Ritter, 371 F.2d 145, 147 (10th Cir.1967); accord Chrysler Credit Corp., 928 F.2d at 1516.

In ruling on Defendants' motions to dismiss for lack of personal jurisdiction and improper venue, I have already discussed some of these factors and explained why they do not warrant a transfer.  For example, I have already determined that the convenience of witnesses does not weigh in favor of a transfer to the Western District of North Carolina, as Defendants have identified only one potential non-party witness who resides in that district, and there are an abundance of potential witnesses residing in other districts.  And since I have concluded that Plaintiffs' *Complaint* states viable and predominant federal RICO claims against each Defendant, this Court is not sitting in diversity jurisdiction and the pendency of other, non-federal claims that arguably may arise under the laws of North Carolina, Tennessee, Texas, or Canada does not weigh in favor of a transfer.

-90-

There are, however, a few remaining factors cited in Defendants' motion to transfer venue that warrant further discussion.  In particular, Defendants assert that Plaintiffs' choice of forum should not be given any weight because Plaintiffs are not New Mexico residents and this state has "no connection to any of the acts giving rise to the lawsuit."  [Doc. 28, at 4.] I disagree with this assertion.

The District of New Mexico has substantial connections to this civil action because the criminal proceedings which occurred in this district form much of the underlying basis for the allegations in Plaintiffs' *Complaint*.  As a practical matter, trying this civil action in the same district as the criminal proceedings is more expeditious and economical than trying it in another district, where a different court unfamiliar with the local rules of the District of New Mexico or the record of the criminal proceedings would have to review the voluminous record of those proceedings in order to decipher the parties' arguments regarding damages and proximate cause.

While it is true that Plaintiffs do not currently reside in New Mexico, they have substantial ties to New Mexico during the period relevant to the injuries asserted in their *Complaint* and thereafter.  Hydro Cut's President/CEO, Mr. Hudak, was operating and managing a substantial amount of business and property in and around Roswell, New Mexico for several years before returning to his current residence in Canada.  His return to Canada appears to result from his immigration status with the United States Government rather than a lack of substantial ties to New Mexico.  Before his return, Mr. Hudak was detained in New Mexico for much of the time that the criminal proceedings against him were pending in this

district.  During this time, Mr. Hudak and other individuals associated with Hydro Cut developed a body of evidence to be used in their defense against the criminal charges, which still resides with Plaintiffs' counsel in New Mexico. Defendants have made no showing that Plaintiffs have more substantial ties or access to counsel in another state.  Under these circumstances, I find that Plaintiffs' choice of forum carries significant weight, as if Mr. Hudak were a *de facto* resident of New Mexico.  See Sunshine Cellular v. Vanguard Cellular Sys., Inc., 810 F. Supp. 486, 500 (S.D.N.Y. 1992).

Defendants also allude to the possibility that this Court will be unable to perform its duties in this civil action because of docket congestion in this district or bias in the jury pool resulting from news coverage of the criminal proceedings here.  I give no credence to these allusions.  While it is true that the District of New Mexico carries a heavy criminal docket, this district's civil docket is not particularly congested in comparison to other districts, and this district has received several new judges in recent years which diminish the predictive value of the statistics cited in Defendants' motion to transfer.

Rather than a congested docket, the pace of this litigation appears to be controlled by the complexity of the issues, as well as the numerous extensions of time that the parties have requested and received in order to answer and complete the briefing on the multiple motions that Defendants have filed and joined.  These requested extensions do not suggest that Defendants' paramount concern is obtaining a speedy trial in this matter.  I find that their proposed transfer is likely to lead to further extensions, delays, and procedural maneuvers, rather than an expeditious resolution of the merits of Plaintiffs' claims.

Defendants' alleged concerns about news coverage of Mr. Hudak's criminal trial also lack merit.  This news coverage was national in scope and occurred several years ago.  Even during its peak, such news coverage did not affect the fairness or integrity of the criminal trial because its potential impact on the jury pool was thoroughly scrutinized during voir dire and jury selection.  Should the need arise again, the parties could avail themselves of similar procedures during voir dire and jury selection in this civil action.

For all of the above reasons, Defendants' motion to transfer venue is denied.  This matter should proceed to discovery without further delay, and I will refer the parties to a United States Magistrate Judge for a pretrial scheduling conference pursuant to Fed. R. Civ. P. 16 forthwith.

### E.    Plaintiffs' State-Law Claims

In addition to the civil RICO claims arising under federal law, Plaintiffs' *Complaint* asserts several claims under state law.  This Court may exercise supplemental jurisdiction over these state-law claims under 28 U.S.C. § 1367, because Plaintiffs' federal claims predominate and provide the basis for this Court's original jurisdiction under 28 U.S.C. § 1331.  See generally Motorola Credit Corp. v. Uzan, 388 F.3d 39, 55-56 (2d Cir. 2004) (affirming district court's exercise of supplemental jurisdiction over state-law claims in RICO case).  Thus, it is unnecessary to address whether this Court also may exercise diversity jurisdiction over these state-law claims pursuant to 28 U.S.C. § 1332 at this preliminary juncture.

None of Defendants' pending motions specifically address the merits of any of Plaintiffs' state-law claims.  To the extent that Defendants wish to file dispositive motions pertaining to any of Plaintiffs' state-law claims in the future, the pendency of such motions should not delay the parties from proceeding with discovery and other pretrial case-management issues associated with Plaintiffs' federal RICO claims.

**III.    CONCLUSION**

For the foregoing reasons, the Court concludes that Defendants' motions to dismiss or transfer this action must be denied.  The denial of Defendants' motions, however, does not mean that Plaintiffs have proven the truth of the allegations in their *Complaint*.  Rather, the Court's rulings at this preliminary juncture only mean that Plaintiffs' *Complaint* states viable civil RICO claims against each Defendant which are properly heard in the District of New Mexico, and therefore Plaintiffs should be afforded the opportunity to conduct discovery and develop evidence in support of these claims without further delay.

**IT IS, THEREFORE, ORDERED** that Defendant *Halliburton Energy Services, Inc.'s Motion to Dismiss Plaintiffs' Complaint for Failure to State a Claim and for Improper Venue* [Doc. 19], as adopted by Defendant Jet Research Center [Doc. 27, 39] is **DENIED**.

**IT IS FURTHER ORDERED** that *Defendant Halliburton Energy Services, Inc.'s Motion to Transfer Venue and Brief in Support* [Doc. 28], as joined by Defendants Accurate Arms Company and John Sonday [Doc. 30] and adopted by Defendant Jet Research Center [Doc. 50] is **DENIED**.

**IT IS FURTHER ORDERED** that *Defendants Accurate Arms Company and John Sonday's Motion for Judgment on the Pleadings for Lack of Personal Jurisdiction, Failure to State a Claim, Improper Venue and Lack of Legal Entity* [Doc. 61] is **DENIED**.

**SO ORDERED**, this 10th day of March, 2006, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge